**Electronically Filed
Supreme Court
SCWC-11-0000697
29-DEC-2015
09:35 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

LOUIS ROBERT SANTIAGO, as Trustee of the Louis Robert Santiago Revocable Living Trust dated November 17, 1999, as amended, and YONG HWAN SANTIAGO, as Trustee of the Yong Shimabukuro Revocable Living Trust dated July 25, 1996, as amended, Petitioners/Plaintiffs-Appellants/Cross-Appellees,

vs.

RUTH TANAKA, Respondent/Defendant-Appellee/Cross-Appellant.

SCWC-11-0000697

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0000697; CIVIL NO. 08-1-0094)

DECEMBER 29, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON JJ.

OPINION OF THE COURT BY POLLACK, J.

## I. Introduction

This case involves the adequacy of disclosures that were made to the buyer during the sale of a commercial property and the seller's subsequent nonjudicial foreclosure and sale of the property when the mortgage payments were briefly interrupted because of an underlying dispute regarding mediation concerning

the property.  Two issues are presented: (1) whether the seller's failure to disclose certain facts regarding the property's sewer system is actionable under the common-law causes of action of nondisclosure and misrepresentation and (2) whether the seller's nonjudicial foreclosure of the property and ejectment of the Santiagos were wrongful under the facts of this case.  We answer both questions in the affirmative.

## II.  Background

### A.  The Santiagos' Lease and Purchase of Nawiliwili Tavern

On January 1, 1998, Louis Santiago (Louis)[1] entered into a twenty-year commercial lease agreement to rent approximately 2,560 square feet of ground floor space of the Nawiliwili Tavern (Tavern) from owner Ruth Tanaka (Tanaka). After leasing the Tavern for over seven years and making all payments due under the lease, including his share of utilities, taxes, assessments, and insurance, Louis and his wife, Yong Hwan Santiago (collectively, the Santiagos), decided to submit an offer to purchase the Tavern from Tanaka.[2]

---

[1]    Louis Santiago is referred to herein as "Louis" when he is acting in his individual capacity.  Louis Santiago and Yong Santiago, acting together, are referred to as "the Santiagos."

[2]    It does not appear that Tanaka personally participated in the negotiations.  All actions, unless otherwise noted, were taken by her real estate agent, Wayne Richardson (Richardson) or her attorney.

## 1.    Negotiations for Purchase of Tavern

In November 2005, Louis, represented by realtor Glenn Takase (Takase) of Coldwell Banker, submitted an offer to purchase the Tavern for $1,000,000.00, in the form of a "Deposit Receipt Offer and Acceptance" (DROA) to Tanaka's property manager and realtor, Wayne Richardson (Richardson).[3]

---

[3]    The DROA contained standard terms, including the following pertinent provisions:

> C-10 **Prorations and Closing Adjustments.**  At closing, Escrow shall prorate the following, if applicable, as of the date of closing: real property tax, lease rents . . . maintenance, private sewer, marina, and/or association fees, tenant rents, and ANY OTHERS.
>
> . . .
>
> **SELLER'S DISCLOSURES** (Required by Hawaii Statute for residential real property)
>
> C-44 **Seller's Obligation to Disclose.**  Under Hawaii law, Seller is obligated to fully and accurately disclose in writing to Buyer any fact, defect, or condition, past or present, that would be expected to measurably affect the value of the Property to a reasonable person. . . . Such Disclosure shall be prepared in good faith and with due care and shall disclose all material facts relating to the Property that: (i) are within the knowledge or control of Seller; (ii) can be observed from visible, accessible areas; or, (iii) which are required by Section 508D-15 of the Hawaii Revised Statutes.
>
> . . .
>
> C-47 **Buyer's Remedies If Seller Fails to Comply with Paragraphs C-44 or C44A.**  . . .  If Seller negligently fails to provide the required disclosure statement or amended disclosure statement, Seller shall be liable to Buyer for the amount of actual damages suffered as a result of the negligence.  In addition to the above remedies, a court may also award the prevailing party's attorneys' fees, courts costs, and administrative fees.

Tanaka did not accept Louis' initial offer, and the parties exchanged multiple counteroffers, all of which referenced and incorporated the DROA.

In January 2006, Tanaka submitted a counteroffer with an attached "Agreement of Sale Addendum to the DROA" (Agreement of Sale Addendum). In her Agreement of Sale Addendum, Tanaka made representations with respect to certain "Monthly Installments (based on current estimates; exact figures to be determined and adjusted at closing)," including "Sewer Fee & Assessments" in the amount of $150.00.[4] The Santiagos rejected Tanaka's January 2006 counteroffer.

### 2. Accepted Purchase Contract

Ultimately, after further negotiations, Louis accepted a subsequent counteroffer from Tanaka (Accepted Counteroffer). The Accepted Counteroffer expressly provided that Tanaka and

---

[4]     Tanaka provided the following accounting of "Monthly Installments" within the Agreement of Sale Addendum:

> 2. **Payment Terms:**
> . . .
> A.   Monthly Installments (based on current estimates; exact figures to be determined and adjusted at closing)
>
> [X] Buyer Collection Fee:          $50.00
> [X] Real Property Taxes:           $300.00
> [X] Insurance Premiums:        $226.00
> [X] Sewer Fee & Assessments:  $150.00
> [X] Other:   Obatake-Lovell        $50.00
> [X] Principal and interest:        $9,436.79
> [X] Estimated Total Monthly Payment:     $10,212.79

Louis "agree[] to sell/buy the [Tavern] on the terms and conditions set forth in the DROA as modified by this Counter Offer." The Accepted Counteroffer set the purchase price of the Tavern at $1,300,000, $800,000 of which was to be paid as a down payment, with the remaining $500,000 secured by a sixty-month "Mortgage, Security Agreement and Financing Statement" (Mortgage) financed by Tanaka. Attached to the Accepted Counteroffer were two addenda: a "Purchase Money Mortgage Addendum" (Mortgage Addendum) setting forth the provisions of the Mortgage and an "Existing 'As Is' Condition Addendum" ("As Is" Addendum).

The stated purpose of the "As Is" Addendum was to note that the "Property [was] being sold in its existing condition" and that "[e]xcept as may be agreed to elsewhere in [the] DROA, [Tanaka] will make no repairs and will convey [the Tavern] without any representations or warranties, either expressed or implied." The addendum stated, however, that "[b]y selling Property in Existing 'As Is' Condition, [Tanaka] remains obligated to disclose in writing any known defects or material facts of Property or improvements." (Emphases added).

### 3. Seller's Disclosures

In April 2006, Tanaka sent Louis a "Seller's Real Property Disclosure Statement" (Disclosure Statement). The

Disclosure Statement expressly stated that it was "intended to assist [Tanaka] in organizing and presenting all material facts concerning the Property" and that Tanaka is "obligated to fully and accurately disclose in writing to a buyer all 'material facts' concerning the property."[5]

The Disclosure Statement further noted, "It is very important that the Seller exercise due care in preparing responses to questions posed in the Disclosure Statement, and that all responses are made in good faith, are truthful and complete to the best of Seller's knowledge," because "Seller's agent, Buyer and Buyer's agent may rely upon Seller's disclosures." Finally, the Disclosure Statement instructed Tanaka, in her capacity as the Seller of the Tavern, to answer all questions and explain all material facts known to her.

---

[5] In full, the purpose of the Disclosure Statement is described as follows:

> **Purpose of Disclosure Statement:** Pursuant to Hawaii Revised Statutes, Chapter 508D (for residential real property), and under common law (for all other real estate transactions, including the sale of vacant land) a seller of residential real property is obligated to fully and accurately disclose in writing to a buyer all "material facts" concerning the property. "Material facts" are defined as "any fact, defect, or condition, past or present, that would be expected to measurably affect the value to a reasonable person of the residential real property being offered for sale." This Disclosure Statement is intended to assist Seller in organizing and presenting all material facts concerning the Property.

(Emphasis added).

As is relevant to the issues presented in this case, question 77 of the Disclosure Statement asked, "What type of waste water/sewage system do you have?" Tanaka checked boxes to indicate that the Tavern was "Connected" to a "Private Sewer." The last page of the Disclosure Statement provided a space for Tanaka to provide further explanation of any prior disclosure. In addition to clarifications pertaining to other questions on the Disclosure Statement, Tanaka referenced question 77 and noted that the Tavern's sewer is a "private sewer line owned by Anchor Cove. We are connected."[6]

Tanaka subsequently disclosed twenty documents pertaining to different aspects of the Tavern, several of which were related to the Tavern's private sewer connection. One of the disclosed documents was an agreement dated May 16, 1995, between Tanaka and James Jasper Enterprises, LLP (Jasper), to connect the Tavern to Jasper's existing private sewer system. The agreement, entitled "Agreement for Maintenance and Operation of Wastewater System and Connection to Wastewater System Located at Nawiliwili, Kauai, Hawaii" (Wastewater Agreement), provided

---

[6] After Takase received and reviewed the Disclosure Statement, Takase made a handwritten notation--"✓ on →"--in the margin next to Tanaka's reference to the private sewer system. Takase testified that his "notation meant 'Check on this private sewer line.'" Thereafter, Takase and Louis reviewed the disclosed documents that related to the private sewer system.

the following pertinent terms for the maintenance and cleanout

charges:

> 5.   Tanaka agrees to pay Jasper monthly maintenance charges in the amount of One Hundred Fifty Dollars ($150.00) per month, payable on or before the fifteenth day of every month, commencing the month immediately after this Agreement is executed by the parties hereto.  Jasper reserves the right to adjust the deposit annually in a sum not exceeding twenty percent (20 percent) of the amount paid in the year immediately preceding.
>
> . . .
>
> 7.   Tanaka agrees to pay Jasper the sum of One Hundred Fifty Dollars ($150.00) as a bi-monthly cleanout charge for the Jasper STP.[7]  Such payments shall commence sixty (60) days after the execution of this Agreement by the parties, and shall be payable on or before the fifteenth day of every other month thereafter.  Jasper reserves the right to adjust the deposit annually in a sum not exceeding twenty percent (20 percent) of the amount paid in the year immediately preceding.
>
> 8.   Tanaka agrees to pay Jasper the sum of Three Hundred Dollars ($300.00) as a deposit for those charges provided for in paragraphs 5 and 7 hereinabove.  Such amount shall be paid upon the execution of this Agreement by the parties.  The deposit shall be refunded to Tanaka in the event the Jasper STP is transferred or conveyed to the County.

(Emphases added).

Based on Tanaka's disclosures and the $150 estimated

monthly installment for sewer fees and assessments represented

in the Agreement of Sale Addendum, Takase and Louis believed the

costs associated with the Tavern's private sewer system were the

amounts listed in the Wastewater Agreement--$150 for a monthly

---

[7] "Jasper STP" is the short-form used in the agreement for Jasper's Anchor Cove Sewage Pump Station.

maintenance fee and $150 for a bi-monthly cleaning fee.  After reviewing the disclosures with Takase and believing that Tanaka had provided all documentation, Louis accepted the disclosed documents.

4.  **Mortgage, Promissory Note, and Closing on Sale of Tavern**

As noted, to finance a portion of the purchase price of the Tavern, the Santiagos obtained a mortgage from Tanaka.  In the Mortgage, the Santiagos covenanted to pay the $500,000 loan pursuant to the terms of a Promissory Note.

The Mortgage provided that in the event of any default "in the performance or observance of any covenant or condition" of the Mortgage or the Promissory Note, "the whole amount of all indebtedness owing" under the Mortgage "shall at the option of the Mortgagee become at once due and payable without notice or demand."  Additionally, the Mortgage provided as follows:

> [T]he Mortgagee may, with or without taking possession, foreclose [the] Mortgage, by court proceeding (with the immediate right to a receivership with the aforesaid powers on ex parte order and without bond pending foreclosure), or, as now or then provided by law, by advertisement and sale of the mortgaged property or any part or parts thereof at public auction in the county in which the mortgaged property are situated . . . .

(Emphases added).

The Promissory Note provided that payment of $9,724.63 was due on the tenth day of each month, commencing on August 10, 2006, until the satisfaction of the debt on August 10, 2011.  It

9

additionally stated that the failure to pay "any sum" due under the Promissory Note constitutes an "Event of Default" and that "[i]f any Event of Default shall occur and be continuing, the entire principal sum and accrued interest thereon" shall "immediately become due and payable."  (Emphasis added).

The parties closed the sale pursuant to the U.S. Department of Housing and Urban Development Settlement Statement (HUD Statement) on August 10, 2006, and the deed transferring the Tavern's title from Tanaka to the Santiagos was recorded on the same day.  The HUD Statement identified the prorated amounts of property taxes and partial month rent due under the Santiagos' former lease agreement, but it was silent as to "maintenance, private sewer, marina, and/or association fees" required to be listed, if applicable, in accordance with paragraph C-10 of the DROA.[8]  The HUD Statement additionally indicated that the total amount due from the Santiagos, including all prorations and closing costs, was $1,317,518.31, an amount that the Santiagos paid as follows: $5,000 as an

_____

[8]    See note 3 for the full text of paragraph C-10 of the DROA.

10

initial deposit, $812,518.31 as an additional deposit, and the remaining $500,000 in accordance to the Mortgage.[9]

### B.    Sewer Fee Dispute

At the beginning of October 2006, Jay Geffert (Geffert), the Santiagos' property manager for the Tavern, received a bill from Jasper in the amount of $3,467.43-- $2,267.77 past due from August's sewer maintenance fees and $1,153.23 for September's sewer maintenance fees, inclusive of taxes.[10]  Geffert, believing Jasper's bill to be a mistake--at the time, he had been paying the Tavern's utility bills, including county sewage bills, since 1998--contacted Jasper to inquire about the bill.  In response, Jasper wrote to Louis, noting that Tanaka had previously paid the sewer fees and that the fees had increased twenty percent a year, every year, since 1995.[11]  Jasper stated that the Tavern could choose an

---

[9]    The $17,518.31 in excess of the agreed-upon purchase price of $1.3 million constitute settlement charges, which included title and recording charges, that the Santiagos had to pay at closing.

[10]    Less than two weeks after the Santiagos closed on the sale of the Tavern, Jasper sent a bill to Tanaka totaling $2,314.20, $1,153.23 for monthly private sewer maintenance and $1,153.23 for bi-monthly sewer cleanout, plus excise taxes.  Tanaka notified Jasper that the Tavern had been sold and instructed that the bill, and all future billings, be sent to the Santiagos.

[11]    In his letter, Jasper outlined the extent to which the monthly maintenance charge and bimonthly cleanout charge had been increased since the Wastewater Agreement was executed: in 1995, Jasper charged $156.25 for monthly maintenance and the same amount for bimonthly cleanout, and in 2006,

(continued. . .)

alternative method of sewage disposal but that, until then, the Santiagos had to continue paying pursuant to the Wastewater Agreement.

Louis' counsel wrote to Tanaka to further inquire about the bill that Louis received from Jasper. Counsel maintained that although the Agreement of Sale Addendum listed a $150.00 sewer assessment fee, Tanaka did not disclose the fact that the sewer fees could, and in fact did, increase by twenty percent per year. Counsel asserted that Tanaka never disclosed the true amount of the fees for the Tavern's sewer service. In conclusion, counsel stated that had Louis known about the possibility that the sewer maintenance charges could be increased by twenty percent per year, he would not have agreed to pay the amount that he agreed to for the Tavern.

Louis' counsel also wrote to Jasper, stating that the Wastewater Agreement was never assigned to the Santiagos when Tanaka conveyed the Tavern to them. Counsel also requested from Jasper an accounting of his cost and expenses in the maintenance of the sewage system and suggested that the costs charged to the Santiagos should be adjusted depending upon the parties' usage

---

(. . .continued)

he was charging $1,160.94 for monthly maintenance and the same amount for bimonthly cleanout.

of the system.  In a forceful response, Jasper intimated no interest in negotiating for a lower price because "the price . . . was agreed to be paid by . . . Tanaka" and because the Wastewater Agreement "does not just provide for the recovery of a pro-rated portion of costs."[12]  Jasper also threatened that if the Santiagos did not "want to be bound by the long standing Agreement," he would "arrange for [the] Tavern to be immediately disconnected from the sewage disposal system."  Finally, Jasper outlined three alternatives to which he was open: (1) the Santiagos pay the total amount owing and agree to be bound to the Wastewater Agreement; (2) the Santiagos accept a 50% deferral of the amount due while they commence an action to recover damages from Tanaka; or (3) the Santiagos disconnect the Tavern from his sewer system and start building their own.

In 2007, the Santiagos filed a Complaint in the circuit court against Jasper and Tanaka asserting claims pertaining to the Wastewater Agreement.  Tanaka filed a motion to dismiss, and the court issued an order granting Tanaka's motion to dismiss without prejudice to allow the parties to

---

[12]     Jasper also questioned the Santiagos' right to demand an accounting since, at the outset, they were not assigned the Wastewater Agreement.

13

"engage in good-faith mediation in a prompt and cooperative manner."[13]

## C.    Attempts to Mediate and Initiation of Foreclosure

Over several months following the circuit court's dismissal of the Santiagos' 2007 complaint, the parties failed to reach an agreement as to the mediator, or the date, time or location of mediation.  Notably, the Santiagos were current with their payments even after they commenced their 2007 action against Tanaka and during the mediation negotiations between the parties.  However, when it became apparent that advances in the mediation proceedings were not forthcoming, and out of frustration from the inability of counsel to reach an agreement as to scheduling the mediation and selection of the mediator, on March 10, 2008, Louis sent Tanaka a handwritten note stating that he halted payment on his account "due to litigation problems," that monthly payments of $10,000 are in a bank account, and that this arrangement "will continue until litigation is resolved."[14]

---

[13]    All circuit court proceedings in this case were presided over by Judge Kathleen N.A. Watanabe.

[14]    Specifically, Louis' note stated, "I Louis Santiago has halted payment on my acc't due to litigation problems!  Monthly payments of $10k are in a bank acc't + will continue until litigation is resolved."  As he had indicated, Santiago "put the ten thousand dollars in a special fund."

On March 11, 2008, one day after Louis sent his letter, Tanaka sent the Santiagos a "Notice of Default and Intention to Foreclose."  Tanaka asserted that because the Santiagos defaulted on the Promissory Note and Mortgage, "the entire principal sum and accrued interest, plus attorneys' fees and costs, are hereby declared <u>immediately due and payable</u>." Tanaka additionally stated that she "has not granted any extensions of time, renewals, waivers or modifications with respect to payment or other provisions of the Note."

On March 12, 2008, Tanaka's mortgage servicer sent the Santiagos a payment notice indicating an amount due of $10,250.86--$9,764.63 for the principal and interest payment due on March 10, 2008, and a late fee in the amount of $486.23.  In a subsequent letter dated April 3, 2008, Tanaka clarified that she intended to foreclose under power of sale pursuant to HRS § 667-5 through 667-10[15] at a public auction on May 9, 2008.

On April 11, 2008, the Santiagos submitted payment for the March mortgage payment and the late fee, as well as payment for the April mortgage payment.[16]  After receiving the Santiagos' payment, Tanaka informed the Santiagos that she was willing to

---

[15]    See note 35 for the complete text of HRS § 667-5.

[16]    A small amount, $15.49, remained due on the account, which Louis paid several days later, on April 15, 2008.

15

postpone the public auction for sixty days, "expressly subject to two conditions: (1) [the Santiagos] must meet their payment obligations, including, but not limited to, attorneys' fees and costs; and (2) [the Santiagos] must not file any lawsuit." Tanaka additionally stated that she "ha[d] not postponed the acceleration of the Note and Mortgage," but "to facilitate the mediation, [she] [was] willing to accept monthly payments, without waiving [] rights and remedies in any respect." The Santiagos thereafter continued to make their monthly mortgage payments, plus an additional $235.37 principal payment each month, and paid Tanaka $15,146.11 in satisfaction of Tanaka's demand for attorneys' fees.[17]

On May 5, 2008, a mediation session was scheduled for June 12, 2008. However, on the same day, because Tanaka did not cancel the scheduled auction sale of the Tavern but only postponed it subject to two conditions, the Santiagos commenced

---

[17]     Preferred Contract Management, Inc., the agency responsible for collecting the Santiagos' mortgage payments and transmitting them to Tanaka, notified the Santiagos that from September 2006 through June 2008, they had paid the following on the mortgage:

         Interest Paid to date: $ 48,125.96
         Principal Pmt to date: $ 170,593.30
         Late Charges to date: $ 486.23
         Attorney Fees to date: $15,146.11
         Collection fees to date: $810.00

         **Total amount of Money Received: $235,161.60**

16

an action against Tanaka asserting several claims. On May 7, 2008, the Santiagos filed a Motion for Temporary Restraining Order and a Motion for Preliminary Injunction, both seeking to "prevent and preclude" Tanaka from proceeding with the foreclosure auction. The circuit court denied the Motion for Temporary Restraining Order and scheduled a hearing on the Santiagos' Motion for Preliminary Injunction for June 17, 2008.

Upon learning of the Santiagos' lawsuit, Tanaka's counsel informed the Santiagos' counsel, on May 15, 2008, that the postponement offer was being withdrawn, the note and mortgage "ha[d] been duly accelerated," and the "entire debt . . . [wa]s due and payable immediately." On June 3, 2008, the Santiagos and Tanaka agreed to engage in mediation and to postpone the foreclosure auction during the pendency of mediation, subject to the Santiagos' "full compliance with their payment obligations" and withdrawal of their Motion for Preliminary Injunction. Subsequently, on July 14, 2008, Tanaka filed a mediator's declaration of impasse and announced that she was "proceed[ing] with the public auction" on August 14, 2008.

### D. The Santiagos' 2008 Complaint

On August 5, 2008, the Santiagos filed a First Amended Verified Complaint in which they asserted claims of negligent

17

misrepresentation and nondisclosure against Tanaka.[18]  On August 20, 2008, the Santiagos filed a Motion for Temporary Restraining Order, again seeking to prevent Tanaka from proceeding with the foreclosure auction.  The circuit court denied the Santiagos' motion later that day.[19]

On August 27, 2008, the parties stipulated that the Santiagos would withdraw without prejudice their Motion for Preliminary Injunction and that Tanaka would postpone the foreclosure sale pending the circuit court's ruling on Tanaka's yet to be filed motion to dismiss.  The motion to dismiss was subsequently filed, and after conducting a hearing on October 15, 2008, the circuit court granted in part and denied in part Tanaka's motion.

Two days later, on October 17, 2008, Tanaka sent the Santiagos a letter informing them that the public auction of the Tavern was to be held on October 24, 2008.  On October 24, 2008, the Santiagos filed a new Motion for Preliminary Injunction, and Tanaka filed her Answer to the Santiagos' First Amended Verified

_____

[18]  The Santiagos additionally asserted claims for "breach of agreement," "breach of good faith and fair dealing," "breach of duty of good faith mediation," and "violation of HRS § 667-42."  These claims were dismissed by the circuit court.

[19]  The Santiagos filed a series of motions for temporary restraining orders and motions for preliminary injunctions seeking to "prevent and preclude" Tanaka from proceeding with the foreclosure auction, all of which were denied by the circuit court.

Complaint and asserted eleven counterclaims.[20]  On the same day, Tanaka held a public foreclosure auction at which she purchased the Tavern by submitting the highest bid of $365,000.00.

### E.   Trial on the Santiagos' Claims for Nondisclosure and Misrepresentation

A bench trial was conducted in May 2011, at the conclusion of which, the circuit court issued its Findings of Fact (FOF), Conclusions of Law (COL) and Order (Trial Order). The court found, inter alia, that Tanaka had provided disclosures indicating that the Tavern's private wastewater and sewer system's monthly service fees may escalate up to twenty percent annually.  The court found that the Wastewater Agreement "contains the necessary information to calculate Defendant's monthly and bi-monthly charges."  The court additionally found that the Santiagos "signed off on these disclosures" and "did not conduct due diligence with respect to sewer service."

The court concluded that after Tanaka "disclosed the private sewer system," "she [was] not required to do anything more."  In fact, according to the court, Tanaka "was not required to disclose the Wastewater Agreement" in the first

---

[20]    Tanaka brought the following counterclaims: "Breach of Note," "Breach of Mortgage," "Breach of Covenant of Good Faith and Fair Dealing," "Ejectment," "Judicial Foreclosure," "Failure to Mediate in Good Faith," "Breach of Confidentiality," "Violation of Order," "Waste," "Impairment of Security," and "Rescission."

instance because that agreement "does not affect [the Santiagos]." Instead, the circuit court concluded that the Santiagos "had access to all material information" and that Tanaka "provided timely and appropriate disclosures of all material facts." Accordingly, the circuit court ordered judgment entered in favor of Tanaka on the Santiagos' claim for negligent misrepresentation and nondisclosure.

With respect to Tanaka's counterclaims and the Santiagos' defenses thereto, the court concluded that HRS § 667-5 does not require that the Mortgage contain "any particular words" to effectuate a power of sale and further concluded that the following language in the Mortgage gave Tanaka the ability to foreclose by power of sale: "The mortgagee may . . . foreclose this Mortgage, (1) by court proceeding . . . or, (2) as now or then provided by law, by advertisement and sale of the mortgaged property . . . at public auction . . . ." The court additionally concluded that the Santiagos did not have a right to cure the default under the loan documents or Hawai'i law.

Accordingly, the circuit court ordered judgment entered in favor of Tanaka and against the Santiagos on Tanaka's counterclaims for "Breach of Note," "Breach of Mortgage," "Breach of Covenant of Good Faith and Fair Dealing," and "Ejectment." The court additionally ordered that Tanaka be

awarded reasonable attorney's fees and costs in the amount of $152,246.61.  By its rulings, the circuit court determined that ownership and possession of the Tavern lawfully belonged to Tanaka, who was at the same time allowed to keep the approximately $1.4 million that the Santiagos paid to her pursuant to the Mortgage and the Promissory Note.

On June 28, 2011, the circuit court filed its Entry of Judgment (Judgment) and issued a Writ of Ejectment ordering the Santiagos to vacate the Tavern.  The Santiagos subsequently vacated the premises pursuant to the court's order.

On July 7, 2011, the Santiagos filed a Motion to Reconsider, Alter, and/or Amend the Court's [Trial Order] and Judgment Thereon (Motion for Reconsideration).  The Santiagos argued that the law of Hawai'i "abhors forfeitures" and that the court's "decision and judgment thereon, if left to stand as is, will result in an over $1.3 million cash forfeiture as the result of [the Santiagos'] purchase of the [Tavern] and their full performance under the" purchase contract and loan documents.[21]

---

[21]    The evidence at trial established that the Santiagos paid Tanaka $585,161.60 in principal, interest, and fees pursuant to the Promissory Note and Mortgage as of May 6, 2011, in addition to the $800,000 down payment, $17,518.31 closing charges, and $10,110.88 in taxes after Tanaka transferred title to the Tavern back to herself.

The Santiagos maintained that the court's decision "will result in a grossly inequitable windfall" to Tanaka, in violation of Hawaiʻi law.  Accordingly, the Santiagos concluded that they were entitled to restitution of $1,342,455.72.[22]

In response, Tanaka argued that the Santiagos were in effect seeking rescission of the 2006 sale, which, if granted by the circuit court, would turn "the trial outcome upside-down, converting [the Santiagos'] loss into a win (and [Tanaka's] win into a loss)."

In their reply, the Santiagos asserted that they were entitled to restitution, not rescission of the purchase contract.  Relying on In re Parish, 2010 WL 1372387, at *2 (Bankr. D. Haw. Apr. 6, 2010), the Santiagos also argued that the right to cure is an equitable right recognized in Hawaiʻi. On August 4, 2011, the circuit court issued an Order Denying the Santiagos' Motion for Reconsideration.

---

[22]    The Santiagos reduced the total amount they had paid by $80,355.99 to offset any actual damages Tanaka had incurred because of the foreclosure sale:  $2,323.64 principal, $12.04 interest, and $78,000.00 as estimated costs to resell the property, which assumed a six percent broker's commission and a sale price of $1.3 million.  The reduction was apparently in light of the trial court's ruling that the foreclosure had been lawfully conducted.

### III.    Appellate Proceedings

### A.    Arguments to the ICA

The Santiagos appealed to the ICA.[23]  The Santiagos argued that the trial court erred in entering judgment for Tanaka on their claims of nondisclosure and negligent misrepresentation.  Specifically, the Santiagos claimed that Tanaka failed to disclose material facts during the course of the negotiations for the sale of the Tavern, including the $1,160.94 monthly sewer maintenance fees and the $1,160.94 bi-

---

[23]    The Santiagos appealed from the Trial Order; the circuit court's Judgment, filed June 28, 2011; the Writ of Ejectment, filed June 28, 2011 (Writ of Ejectment); Order Denying "Plaintiffs' Ex Parte Motion for a Temporary Stay Pending the July 19, 2011 Hearing on Plaintiffs' 'Emergency Motion for a Temporary Stay of Enforcement of the Court's Writ of Ejectment Pending Disposition of Plaintiffs' Motion to Reconsider, Alter, or Amend the Judgment and Pending Disposition of Plaintiff's Motion for Stay Pending Appeal,'" filed July 14, 2011 (Order Denying the Santiagos' Motion for a Stay); Order Denying Plaintiffs' Emergency Motion for a Temporary Stay of Enforcement of the Court's Writ of Ejectment Pending Disposition of Plaintiffs' Motion to Reconsider, Alter, or Amend the Judgment and Pending Disposition of Plaintiffs' Motion for Stay Pending Appeal, filed August 4, 2011 (Order Denying the Santiagos' Motion to Stay Ejectment); Order Denying Plaintiffs' Motion for a Stay Pending Appeal, filed August 4, 2011; Order Denying Plaintiffs' Motion to Reconsider, Alter, and/or Amend the Court's Findings of Fact, Conclusions of Law and Order, and Judgment Thereon, filed August 4, 2011 (Order Denying the Santiagos' Motion for Reconsideration); and Order Granting in Part and Denying in Part Defendant/Counter-Plaintiff Ruth Tanaka's Motion for Fees and Costs, filed August 22, 2011 (Order Granting Tanaka's Fees).

The Santiagos also challenged the circuit court's judgment on Tanaka's counterclaims of breach of note, breach of mortgage, and ejectment, and in denying the Motion for Reconsideration.

Tanaka filed a cross appeal, which is not before this court and, thus, will not be discussed.

monthly sewer cleanout charges that Tanaka had been required to pay.

Alternatively, the Santiagos contended that Tanaka failed to disclose that, if the Santiagos were to buy the Tavern, they would be required either to negotiate with Jasper for future sewer service or to build their own sewage disposal system necessary to operate the Tavern. According to the Santiagos, they were misled by the documents, included in Tanaka's Agreement of Sale Addendum to the DROA, that represented $150 monthly sewer fee and assessment.

Additionally, the Santiagos asserted that the trial court erred in entering judgment in favor of Tanaka on her counterclaims of breach of note, breach of mortgage, and ejectment, and in denying the Motion for Reconsideration. The Santiagos maintained that the Mortgage did not accord Tanaka the power of non-judicial foreclosure of the Tavern because the Mortgage allowed such power only as "now or then provided by law." Hawai'i law, according to the Santiagos, does not independently provide the power of non-judicial foreclosure, and the Mortgage did not contain a power of sale.

Further, the Santiagos argued that the circuit court erred because "the Santiagos cured the alleged default under the note and [Mortgage] pursuant to" HRS § 667-5(c) over six months

before the foreclosure auction.  The Santiagos also contended that the right to cure exists as an "equitable right" in Hawai'i.

Finally, the Santiagos maintained that the trial court "erroneously awarded Tanaka an additional $152,246.61 in attorneys' fees and costs, even though any award of attorneys' fees and costs should have been offset by the Santiagos' forfeiture of over $1.4 million paid by them to Tanaka."

In her Answering Brief, Tanaka first addressed the Santiagos' claim for nondisclosure and misrepresentation. Tanaka argued that she provided adequate disclosure of the Wastewater Agreement and that the Santiagos had "all the information they needed to make further inquiry" but ultimately failed to exercise due diligence.  Tanaka contended that the Santiagos "hang their case on a one-line entry of the County fees (as opposed to the Jasper charges) on a pre-printed Agreement of Sale form that was rejected and that never became part of the contract."

Additionally, Tanaka argued that the Santiagos' claims were moot because the Tavern had since been sold to a third party.[24]  Tanaka also maintained that she did not act in bad

_____

[24]   Tanaka moved to dismiss the Santiagos' second point of error as moot because according to Tanaka's declaration in support of her dismissal motion, the Tavern had been resold to a third party on May 1, 2012, after the circuit court rendered its Judgment.  On May 24, 2012, the Santiagos filed a

(continued. . .)

faith by exercising her contractual right to accelerate the Mortgage and foreclose upon the Santiagos' default. Finally, Tanaka argued that Hawai'i law does not provide for the "right to cure" and maintained that she never consented to allow the Santiagos the ability to cure their default.

In their reply, the Santiagos stated that while they received a copy of the Wastewater Agreement, the agreement "clearly did not establish such high payments." The Santiagos also reiterated that the Wastewater Agreement did not apprise them that "they would . . . have to negotiate for sewer service[] or construct their own sewage disposal system in order to operate the [Tavern]."

The Santiagos further argued that the "plain reading of [the Wastewater Agreement] establishes fees in the amount of $150, and allowed only for an increase of the $300 'deposit.'" In conclusion, the Santiagos maintained that the Judgment "resulted in a forfeiture of the entire $1,412,790.79" that they paid.

---

(. . .continued)

memorandum in opposition to the motion. Subsequently, on June 6, 2012, the ICA issued an order denying the motion.

### B.    The ICA's Opinion

On November 28, 2014, the ICA issued its memorandum opinion (Opinion) in which it affirmed the circuit court's Judgment; Trial Order; Writ of Ejectment; Order Denying the Santiagos' Motion for Reconsideration; and the Order Granting Tanaka's Fees in the circuit court.

The ICA found that the Santiagos did not show the circuit court erred in concluding that Tanaka provided sufficient disclosure of the sewer fees.  The ICA reasoned that, "[i]n light of Tanaka's disclosures, the circuit court properly concluded that the Santiagos should have exercised due diligence," which they failed to do by not further investigating the sewer system.  The ICA concluded that "the Santiagos were put on notice of the monthly payments made to Jasper and that Jasper reserved the right to raise payments 20 percent annually."

In evaluating the Santiagos' nondisclosure claim under Section 551 of the Restatement (Second) of Torts, the ICA concluded that the Restatement "only requires a party to correct a prior representation when the party knows clarification is necessary to prevent the representation from being misleading." The ICA found that the Santiagos did not "make [any] argument regarding Tanaka's knowledge" and that "there is no evidence

27

suggesting that Tanaka knew clarification was necessary." Thus, in finding that the Wastewater Agreement "provided actual notice that the Jasper charges were separate from the County fees," the ICA concluded that the circuit court did not erroneously rule in favor of Tanaka on the nondisclosure and misrepresentation claims.

The ICA next considered whether the Santiagos' claims, that the Mortgage "did not contain a power of sale clause" and that they "cured the alleged default," were moot due to Tanaka's sale of the Tavern to a third party. The ICA concluded that it could not "grant effective relief in terms of title or possession of the property" in light of the sale of the Tavern. Accordingly, the ICA did not reach the merits of the Santiagos' arguments concerning power of sale and cure. However, the ICA concluded that the case was not moot as to "the Santiagos' contention that the circuit court improperly awarded to Tanaka both the property and all amounts paid by the Santiagos."

As to the Santiagos' claim that Tanaka's retention of the Tavern and payments would amount to a windfall, the ICA concluded that the Santiagos were unable to demonstrate their entitlement to relief because they remained in possession of the Tavern for almost three years after foreclosure and because they did not proffer any evidence to establish the value of the

Tavern at the time of default or foreclosure so "as to provide support for an assertion that Tanaka reaped a windfall."  The ICA concluded that the circuit court did not abuse its discretion in denying the Santiagos' Motion for Reconsideration.

Accordingly, the ICA affirmed the Judgment and issued its Judgment on Appeal on January 6, 2015.  The Santiagos filed an application for writ of certiorari to this court on February 5, 2015.

## IV.    Standards of Review

A trial court's findings of fact are reviewed under the "clearly erroneous" standard of review.  Beneficial Haw., Inc. v. Kida, 96 Hawai'i 289, 305, 30 P.3d 895, 911 (2001).  A finding of fact is determined to be clearly erroneous when "the record lacks substantial evidence to support the finding," or "despite evidence in support of the finding, the appellate court is left with a definite and firm conviction . . . that a mistake has been committed."  Id. (first quoting Alejado v. City & Cty. of Honolulu, 89 Hawai'i 221, 225, 971 P.2d 310, 314 (App. 1998); and then quoting State v. Kane, 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998)).  The circuit court's conclusions of law are reviewed de novo, under the right/wrong standard.  Haw. Nat'l Bank v. Cook, 100 Hawai'i 2, 7, 58 P.3d 60, 65 (2002).

29

## V.     Discussion

## A.   Nondisclosure and Negligent Misrepresentation

In Hawai'i, claims for nondisclosure are governed by the Restatement (Second) of Torts § 551 (Am. Law Inst. 1977). See Molokoa Vill. Dev. Co. v. Kauai Elec. Co., 60 Haw. 582, 590, 593 P.2d 375 (1979); Pancakes of Haw., Inc. v. Pomare Props. Corp., 85 Hawai'i 300, 318, 944 P.2d 97, 115 (App. 1997); Sung v. Hamilton, 710 F. Supp. 2d 1036, 1047 (D. Haw. 2010) (noting that, under Hawai'i law, fraud can be committed "by non-disclosure as well as by an affirmative misrepresentation").[25] Section 551 of the Restatement provides, in pertinent part, as follows:

> (1)  One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

---

[25]     The allegations supporting the Santiagos' negligent misrepresentation claim are fundamentally the same as those supporting the nondisclosure cause of action.  For negligent misrepresentation, the Santiagos assert that Tanaka misrepresented the true amount of sewer fees that she was paying Jasper, stating that the amount was only $150 when in fact it had increased to $1,160.94 for sewer maintenance and the same amount for bi-monthly cleanout charges.  For their nondisclosure claim, the Santiagos allege that Tanaka failed to disclose the true amount of sewer fees based on her agreement with Jasper.

(2)    One party to a business transaction is under a duty
       to exercise reasonable care to disclose to the other
       before the transaction is consummated,

(b)    matters known to him that he knows to be necessary to
       prevent his <u>partial or ambiguous statement of the
       facts from being misleading</u>; . . . .

Restatement (Second) of Torts § 551 (1977) (emphases added).

The Restatement further explains the circumstances under which a party in a business transaction has a duty to disclose facts to the other in order to prevent a partial or ambiguous statement from being misleading:

<u>A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not.</u>  So also may a statement made so ambiguously that it may have two interpretations, one of which is false.  When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient.  In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.

Restatement (Second) of Torts, § 551 cmt. g (emphasis added).

In this case, Tanaka's disclosure duties to Santiago under the DROA required Tanaka to "<u>fully and accurately disclose in writing to [the Santiagos] any fact</u>, defect, or condition, past or present, <u>that would be expected to measurably affect the value of the Property to a reasonable person</u>."[26]  (Emphases added).  In disclosing these facts, Tanaka was expected to, and

_____

[26]    Although the parties exchanged numerous counteroffers, there was only one DROA, dated November 23, 2005.  Each counteroffer referenced and incorporated the DROA's terms, unless otherwise expressly amended by the counteroffer.

indeed was required to, prepare the disclosures "in good faith and with due care" and ensure that she "disclose[d] all material facts relating to the Property that [] [were] within [her] knowledge or control."  (Emphasis added).  The DROA further provided, "At closing, Escrow shall prorate the following, if applicable, as of the date of closing: real property tax, lease rents . . . maintenance, private sewer, marina, and/or association fees, tenant rents, and ANY OTHERS."  (Emphases added).

Attached to the Accepted Counteroffer were a Mortgage Addendum, which set forth the provisions of the seller-financed Mortgage, and an "As Is" Addendum.  Pursuant to the "As Is" Addendum, Tanaka "remain[ed] obligated to disclose in writing any known defects or material facts of [the Tavern]."  (Emphasis added).

As required by her duty under the DROA and "As Is" Addendum, on April 4, 2006, Tanaka sent the Santiagos her Disclosure Statement.  The Disclosure Statement provided that Tanaka, "[p]ursuant to Hawaii Revised Statutes, Chapter 508D (for residential real property), and under common law (for all other real estate transactions)," was "obligated to fully and accurately disclose in writing to a buyer all 'material facts' concerning the property."  (Emphases added).  It also defined

"material facts" as "any fact, defect, or condition, past or present, <u>that would be expected to measurably affect the value to a reasonable person of the residential real property being offered for sale.</u>"  (Emphasis added).  The Disclosure Statement underscored that the "Seller's agent, Buyer and Buyer's agent <u>may rely</u> upon Seller's disclosures."  (Emphasis added).

In her responses in the Disclosure Statement, Tanaka noted that the Tavern was connected to a private sewer system. The last page of the Disclosure Statement provided space for Tanaka to provide further explanation or clarification to her answers.  With respect to the sewer, Tanaka wrote only that "it's a private sewer line owned by Anchor Cove.  We are connected."

Roughly a week after sending her Disclosure Statement, Tanaka provided the Santiagos the Wastewater Agreement dated May 16, 1995.  The Wastewater Agreement provided that Tanaka agreed to pay Jasper $150 per month for monthly maintenance charges and $150 as a bi-monthly cleanout charge. Also indicated in the Wastewater Agreement was Jasper's <u>reservation of "the right to adjust the deposit</u> annually in a sum not exceeding twenty percent (20%) of the amount paid in the year immediately preceding."  (Emphasis added).

After the Santiagos reviewed Tanaka's Disclosure Statement and other disclosed documents with Takase, the Santiagos signed off on the disclosures, believing that Tanaka "provided all of the documentation." Based on Tanaka's disclosures, specifically the Wastewater Agreement, and representations during negotiations--namely, Tanaka's estimate of monthly expenses provided in her Agreement of Sale Addendum-- Takase and the Santiagos believed that the costs associated with the private sewer system were $150.00 per month for maintenance and $150.00 bi-monthly for cleanout charges.

At closing, pursuant to paragraph C-10 of the DROA,[27] escrow prepared an HUD Statement, based on information provided by Tanaka, that itemized the fees and prorated amounts due from the Santiagos to complete the sale, including prorated property taxes and partial month rent due under the Santiagos' former lease agreement. However, the HUD Statement did not include prorated private sewer fees even though the sale closed in the middle of the month and the DROA expressly required such an itemization. Takase testified that had the sewer fees been prorated on the HUD statement, he and the Santiagos "would have

---

[27]     See supra note 3.

found out" about the actual amount due for Jasper's private sewer service.

The foregoing facts clearly establish that Tanaka did not disclose to the Santiagos the true amount of the private sewer fees while they were negotiating for the sale of the Tavern in 2006. Further, the uncontroverted evidence demonstrates that Tanaka paid the private sewer fees prior to the Santiagos' purchase of the Tavern and, thus, knew not only the amount of the monthly and bi-monthly charges but also that the fees had increased each year by 20%.

Despite her knowledge, Tanaka never informed the Santiagos that the amount due under the Wastewater Agreement was (1) the single largest ownership expense of the Tavern, approximately equal to 20% of the agreed-to monthly mortgage payments,[28] or (2) subject to an increase of 20% each year, which Jasper had implemented annually since the inception of the Wastewater Agreement in 1995. Further, although Richardson testified that the Santiagos were "not bound by [the] agreement," Tanaka did not disclose that if the Santiagos chose not to accept the terms of the Wastewater Agreement, they would

---

[28] Richardson acknowledged that the Jasper sewer fees were the highest operating expense for the Tavern.

35

be required to (1) attempt to negotiate a new agreement with Jasper or (2) construct their own sewer system.

It cannot be seriously disputed that the difference between a sewer service fee of $225 monthly and the true price of approximately $1,700 per month,[29] and the possibility of having to build a completely new sewer system if the Santiagos were to refuse binding themselves to the Wastewater Agreement, are facts that "may justifiably induce" the Santiagos, or any reasonable person standing in their shoes, to "act or refrain from acting" in the purchase of the Tavern, Restatement (Second) of Torts § 551(1), by seeking to renegotiate the terms of the Promissory Note and Mortgage, recalibrating the agreed-upon price, or walking away from the transaction altogether. Indeed, Louis testified that he and his wife would not have purchased the Tavern for $1.3 million had they known the actual sewer fees and the terms under which those fees could be increased annually. The substance and significant character of the undisclosed facts, and the incomplete and misleading nature of

---

[29] Because the disclosed sewer fees are composed of $150 for maintenance fees per month and $150 bi-monthly (or $75 per month) for cleanout charges, the total monthly sewer fees based on Tanaka's disclosures is $225. The $1,700 per month figure is the sum of the $1,160.94 monthly maintenance fees and half of the $1,160.94 bi-monthly cleanout charges (or approximately $600 per month) that Jasper was actually charging for his sewer service.

the disclosed facts, leave little room for doubt that they may have "justifiably induce[d]" the Santiagos to "act or refrain" from taking actions in their purchase of the Tavern.  Id.

Tanaka's knowledge that these facts would cause justifiable inducement on the Santiagos' part was established by Tanaka's awareness of the actual, non-disclosed price for Jasper's sewer service, the disparity between the actual price and the disclosed price, the failure to clarify that the price had been actually subject to significant annual increases although the Wastewater Agreement provided that the increase was to be applied only to the deposit, and the fact that the Disclosure Statement that Tanaka completed unequivocally stated that the Santiagos and Takase may rely upon her representations therein.  See Jones v. Great Am. Life Ins. Co., No. 2:13-CV-02153, 2015 WL 417909, at *5 (W.D. Ark. Jan. 30, 2015) (inferring from the facts and circumstances the defendant's knowledge of the falsity of the representation).  The aggregate of these facts demonstrates Tanaka's knowledge that her inaccurate and incomplete disclosure could have been relied upon by, and thus may have justifiably induced, the Santiagos to act or to refrain to act.

Additionally, Tanaka's representation in the Agreement of Sale Addendum--that "based on current estimates," the "Sewer

Fee & Assessments" were $150--proved to be a partial, ambiguous, and misleading statement.[30]  Richardson testified that the amount reflected under "Sewer Fee & Assessments" constituted the county sewer fees, not the private sewer fees.  But Geffert, who had been paying county sewer fees for eight years at the time the parties were negotiating for the sale of the Tavern, testified that county sewer fees were more than double the amount under "Sewer Fee & Assessments."  Further, based in part on the size of the Tavern and the Santiagos' knowledge of the building and expenses paid during their seven-year tenancy, the Santiagos believed Tanaka's estimate of $150 reflected the amount of the private sewer fees.

Because Tanaka's representation on the Agreement of Sale lacked additional information or clarification, the estimated "Sewer Fee & Assessments" was ambiguous.  Thus, under comment g of Section 551 of the Restatement, because Tanaka's statement was subject to two possible interpretations, one of

_____

[30]    Although the Agreement of Sale Addendum was part of a rejected counteroffer and thus did not become part of the contract between the parties, her representations therein are relevant to the Santiagos' claims for nondisclosure and misrepresentation.

which was false, Tanaka was required to provide further disclosures to prevent her statement from being misleading.[31]

Tanaka subsequently disclosed the Wastewater Agreement that, on its face, appeared to confirm the Santiagos' interpretation of Tanaka's "Sewer Fee & Assessments" estimate. The Wastewater Agreement provided that Tanaka paid Jasper $150 in monthly private sewer maintenance charges and $150 in bi-monthly sewer cleanout charges, the same numerical amount indicated in Tanaka's estimate. Consequently, Tanaka's representation on the Agreement of Sale Addendum appeared to confirm that the fees listed within the Wastewater Agreement were accurate.

Tanaka's contention throughout this case, that the express terms of the Wastewater Agreement provided that Jasper could increase the monthly and bi-monthly fees by up to 20% annually and that the Santiagos therefore had adequate notice that the sewer fees may be greater than $150, is unavailing; the plain language of the Wastewater Agreement provides that Jasper only "reserve[d] the right to adjust the <u>deposit</u> annually in a sum not exceeding twenty percent (20%)." Thus, contrary to

_____

[31] Additionally, "[t]his court has affirmed the general rule that, in interpreting contracts, ambiguous terms are construed against the party who drafted the contract." <u>Luke v. Gentry Realty, Ltd.</u>, 105 Hawai'i 241, 249, 96 P.3d 261, 269 (2004).

Tanaka's argument, the Wastewater Agreement provides a reservation to increase the deposit, not the monthly sewer maintenance fees or the bi-monthly sewer cleanout fees.

Tanaka's contention is further refuted by trial testimony supporting the conclusion that the terms of the Wastewater Agreement were, at best, ambiguous and misleading. Richardson acknowledged that the plain terms of the agreement did not state that the monthly and bi-monthly fees could be increased by 20% per year. Richardson specifically testified that "perhaps the people who drafted [the agreement] made an error" by providing that the "deposit" rather than the "maintenance fee" could be increased by up to 20% a year.

On the other hand, the Santiagos' realtor, Takase, testified that based on all the disclosures he received, he believed that the sewer fees were "$150 for a maintenance fee, and $150 cleaning fee," as stated on the face of the Wastewater Agreement. Thus, if in fact the Wastewater Agreement provided that Jasper had the ability to increase the monthly and bi-monthly fees by 20% a year, the drafting "mistake" rendered the otherwise plain and clear provisions of the Wastewater Agreement ambiguous and misleading. Thus, Tanaka had a "duty to disclose the additional information necessary to prevent" the Wastewater

Agreement from misleading the Santiagos. Restatement (Second) of Torts § 551(2)(c).

An additional opportunity for Tanaka to apprise the Santiagos of the true price for Jasper's sewer service arose at closing, when Tanaka was contractually bound, in accordance with paragraph C-10 of the DROA, to direct escrow to complete the HUD form to reflect, among other things, private sewer fees. At this juncture, Tanaka again failed to clarify the ambiguity and inaccuracy of her previous disclosures by not specifying the appropriate proration of Jasper's sewer fees, which, according to Takase, could have alerted the Santiagos to the true costs.

Thus, under Section 551 of the Restatement, to prevent her partial and ambiguous statements from being misleading, Tanaka had a duty to disclose the monthly amount of the sewer fees. By failing to disclose the amount of the Tavern's monthly sewer fees, Tanaka breached this duty.

Accordingly, for the reasons discussed, the circuit court's Trial Order was based on multiple erroneous findings and misapprehension as to the applicable law. First, contrary to the circuit court's findings and conclusions that the Santiagos' alleged failure to conduct due diligence barred their claims for nondisclosure and misrepresentation, "[the] duty to avoid misrepresentations is so strong that the deceived party is not

41

charged with failing to discover the truth." V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 415 (1st Cir. 1985) (citing Snyder v. Sperry & Hutchinson Co., 333 N.E.2d 421 (Mass. 1975)) ("[I]f the seller's representations are such as to induce the buyer not to undertake an independent examination of the pertinent facts, lulling him into placing confidence in the seller's assurances, his failure to ascertain the truth through investigation does not preclude recovery."); see also Yorke v. Taylor, 124 N.E.2d 912, 916 (Mass. 1955) ("The recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation.").  Thus, Tanaka's partial and ambiguous disclosures are not excused by any alleged failure on the Santiagos' part to further investigate the information provided to them.[32]  The circuit court's contrary conclusions and findings are therefore erroneous.

Tanaka also had an affirmative duty, based on the clear contractual terms of the DROA, "As Is" Addendum, and

---

[32]    Despite the circuit court's finding that the Santiagos failed to exercise appropriate due diligence because they "did not take care to protect their own interest, or obtain professional advice," the Santiagos were represented throughout the purchase by Takase, an experienced professional broker, who guided and assisted them in their purchase of the Tavern.  Thus, the court's contrary finding is clearly erroneous.

Seller's Disclosures, to "fully and accurately disclose in writing" "all material facts" to the Santiagos prior to finalizing the sale of the Tavern.  Therefore, Tanaka's failure to disclose material facts, standing alone, clearly violated her duty to disclose, and the circuit court's conclusion that Tanaka "was not required to disclose the Wastewater Agreement" is erroneous.

Additionally, the circuit court's finding that the Wastewater Agreement "provides for annual escalation (up to 20%) of both the monthly maintenance charges and the bi-monthly cleanout charge" was clearly erroneous because, as discussed, the plain, unambiguous language of the Wastewater Agreement established monthly sewer maintenance fees in the amount of $150 and bi-monthly sewer maintenance fees in the same amount. Although the agreement provided that Jasper reserved the right to increase the "deposit" by up to 20% per year, the Wastewater Agreement did not provide for any increase to the monthly or bi-monthly sewer fees.  Thus, the circuit court's conclusion that the Wastewater Agreement provides for annual escalation of the sewer fees, and that the agreement "contains the necessary information to calculate [the Santiagos'] monthly and bi-monthly charges," was clearly erroneous.  Similarly erroneous is the circuit court's related conclusion that the Santiagos "had

access to all material information" and that Tanaka "provided timely and appropriate disclosures of <u>all material facts</u>."

For these reasons, the circuit court and the ICA both erred in concluding that Tanaka did not have a duty to disclose, and did not breach her duty to disclose, the actual monthly fees of the private sewer system and the fact that the Santiagos, if they chose not to accept the terms of the Wastewater Agreement, would be required to negotiate a new private sewer contract or otherwise construct their own sewer system. <u>See</u> Restatement (Second) of Torts § 551(1). Additionally, once Tanaka made partial or ambiguous statements as to the amount of the private sewer fees, she breached her duty by subsequently failing to disclose the additional information necessary to prevent her disclosures and statements from misleading the Santiagos. <u>See</u> Restatement (Second) of Torts § 551(2)(b), cmt. g.

The foregoing facts also establish proof of the Santiagos' negligent misrepresentation cause of action. Negligent misrepresentation has the following elements: "(1) false information be supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) the recipient relies upon the misrepresentation." <u>Blair v. Ing</u>, 95 Hawai'i 247, 269, 21

P.3d 452, 474 (2001) (citing Restatement (Second) of Torts §

552); Zanakis-Pico v. Cutter Dodge, Inc., 98 Hawai'i 309, 321, 47

P.3d 1222, 1234 (2002); see also Chun v. Park, 51 Haw. 462, 468,

462 P.2d 905, 909 (1969) ("We believe § 552 of Restatement

(Second) of Torts . . . is a fair and just restatement of the

law on the issue of negligent misrepresentation.").

As discussed, Tanaka provided false information

regarding the sewer charges to the Santiagos by only disclosing

that Jasper's sewer fees were $150.00 per month for maintenance

and $150.00 bi-monthly for cleanout charges when in fact Tanaka

had been paying Jasper $1,153.23 for monthly private sewer

maintenance and the same amount for bi-monthly sewer cleanout.

Further, Tanaka did not clarify that the express terms of the

Wastewater Agreement, which allowed Jasper to increase the

deposit every year, was inaccurate because the contractual

annual increase was actually being applied to the sewer fees.

With respect to the loss element, the Santiagos were required to

pay substantially more for sewer fees than what Tanaka

represented and what the Wastewater Agreement reflected.  The

reliance element is also established by Louis' testimony that he

and his wife would not have bought the Tavern had they known the

true amount of sewer fees associated with ownership of the

Tavern.  Accordingly, the uncontroverted evidence established

that Tanaka is liable for negligent misrepresentation, and the circuit court and the ICA erred in entering judgment against the Santiagos on this claim.

## B. The Non-Judicial Foreclosure of the Tavern Under HRS § 667-5 Was Unauthorized

In 2008, Tanaka conducted a nonjudicial foreclosure under the provisions of HRS § 667-5 (Supp. 2008).  The circuit court held that Tanaka "complied with applicable foreclosure statutes" and that the Santiagos "did not establish any defense to foreclosure."  Specifically, the circuit court determined that the Santiagos' arguments related to their defense of wrongful foreclosure to Tanaka's ejectment counterclaim--that there was no power of sale in the Mortgage and that they cured their default--were without merit.[33]  Accordingly, the court issued a writ of ejectment, which the ICA later affirmed.

---

[33] On appeal, the ICA did not reach these two issues after determining that the Santiagos' challenges to the circuit court's decision on Tanaka's counterclaims were rendered moot by the resale of the Tavern to a third party, making it impossible to return title and possession to the Santiagos.  Santiago v. Tanaka, No. CAAP-11-0000697 (App. Nov. 28, 2014) (mem).

The ICA may have concluded that any challenge to ejectment and the underlying nonjudicial foreclosure had been rendered moot because it was not possible to award the classic remedy for such a cause of action: return of title and possession.  However, money damages, which the ICA found were within its purview to award, may be substituted for title and possession in certain instances pursuant to the equitable powers of a court in adjudicating a case arising from a mortgage foreclosure, see infra.  Thus, the ICA should have addressed the Santiagos' argument as to their right to cure a default and the lack of a nonjudicial power of sale in the Mortgage.

## 1.   The Authority to Contract a Power of Sale under HRS § 667-5

Prior to its repeal in 2012,[34] HRS § 667-5 authorized

the non-judicial foreclosure of mortgaged property only "[w]hen

a power of sale is contained in a mortgage."  HRS § 667-5(a).[35]

This court examined HRS § 667-5 in Lee v. HSBC Bank USA, 121

Hawai'i 287, 218 P.3d 775 (2009), and found that that it

"authorize[d] nonjudicial foreclosure under a power of sale

---

[34]     HRS §§ 667-5 to 667-10 governed the process of foreclosure by power of sale (i.e., non-judicial foreclosure) and were within Part I of Chapter 667.  HRS §§ 667-5 to 667-8 were repealed by the legislature in 2012. 2012 Haw. Sess. Law Act 182, § 50 at 684.

[35]     In 2008, HRS §§ 667-5 provided in relevant part as follows:

>     (a)   When a power of sale is contained in a mortgage, and where . . . any person authorized by the power to act in the premises, desires to foreclose under power of sale upon breach of a condition of the mortgage, the . . . person shall be represented by an attorney who is licensed to practice law in the State and is physically located in the State. . . .

>     . . .

>     (c)   Upon the request of any person entitled to notice pursuant to this section and sections 667-5.5 and 667-6, the attorney, the mortgagee, successor, or person represented by the attorney shall disclose to the requestor the following information:

>>     (1)   The amount to cure the default, together with the estimated amount of the foreclosing mortgagee's attorneys' fees and costs, and all other fees and costs estimated to be incurred by the foreclosing mortgagee related to the default prior to the auction within five business days of the request; and

>>     (2)   The sale price of the mortgaged property once auctioned.

clause contained in a mortgage." Id. at 289, 218 P.3d at 777 (emphases added). In Lee, the plaintiffs argued, and this court agreed, that "no state statute creates a right in mortgagees to proceed by non-judicial foreclosure; the right is created by contract." Id. at at 292, 218 P.3d at 780.

Thus, this court has held that HRS § 667-5 does not provide the nonjudicial power of foreclosure but only allows its creation, if the parties choose to do so, within the four corners of a contract. See id.; see also Apao v. Bank of N.Y., 324 F.3d 1091, 1095 (9th Cir. 2003) (finding that HRS § 667-5 "did not confer the power of sale, but merely authorized the parties to contract for the express terms of foreclosure upon default").

> Here, the mortgage states as follows:
>
> But upon any default . . . the Mortgagee may with or without taking possession, foreclose this Mortgage,
>
> by court proceeding . . . , or,
>
> as now or then provided by law, by advertisement and sale of the mortgaged property . . . at public auction . . . .

(Emphasis added). The right to sell the Tavern under the Mortgage is qualified by the phrase "now or as then provided by law." Thus, we analyze the import of "now or as then provided by law."

Under principles of contract interpretation, an agreement should be construed as a whole and its meaning

48

determined from the entire context and not from any particular word, phrase, or clause. Ching v. Hawaiian Rests., Ltd., 50 Haw. 563, 565, 445 P.2d 370, 372 (1968). "Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous." Restatement (Second) of Contracts § 203 (1981), cmt. b. Contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech. Found. Int'l, Inc. v. E.T. Ige Constr., Inc., 102 Hawai'i 487, 495, 78 P.3d 23, 31 (2003). Where a term or a clause remains open to more than one reading, we construe any ambiguity "against the party who drafted the contract." Luke v. Gentry Realty, Ltd., 105 Hawai'i 241, 249, 96 P.3d 261, 269 (2004).

The Mortgage--the relevant contract in this case-- states that "upon any default . . . the Mortgagee may with or without taking possession, foreclose this Mortgage . . . as now or then provided by law . . . . " (Emphasis added). As written, HRS § 667-5 is the only source from which the Mortgage's power to foreclose may be derived. However, HRS § 667-5 does not independently provide for a power of sale, and, as noted, it only authorizes a sale where such a power is contained in a mortgage. Lee, 121 Hawai'i at 289, 218 P.3d at

49

777.  Thus, the Mortgage does not provide for a power of sale that would have authorized Tanaka's nonjudicial foreclosure.

Alternatively, the clause "as now or then provided by law" at a minimum creates an ambiguity for two reasons.  First, as noted, the Mortgage defers to the statute, but the statute similarly defers to the Mortgage.  The plain language of the Mortgage creates a chicken-and-egg situation where it is not clear whether the power of sale is created within the document (as required by the statute) or created within the statute (as contemplated by the Mortgage).  Second, the meaning of the clause "as now or then provided by law" is unclear.  The Santiagos have represented that the phrase only "allows" foreclosure as otherwise provided by law.  Another meaning could be that the phrase "the Mortgagee may . . . foreclose this Mortgage" creates the power of sale, and the succeeding phrase "as now or then provided by law" sets forth the manner in which the power of sale must be exercised.

Where there is an ambiguity, the ambiguity is construed against the drafter--Tanaka.  Luke, 105 Hawai'i at 249, 96 P.3d at 269.  Thus, if "as now or then provided by law" is interpreted as an ambiguity, the clause should be given the meaning that the Mortgage only allows nonjudicial foreclosure as provided by law.  Since HRS § 667-5, the section under which the

nonjudicial foreclosure sale was conducted, requires a power of sale to be contained in a mortgage, Lee, 121 Hawai'i at 289, 218 P.3d at 777, a power that the Mortgage in this case did not provide, Tanaka's nonjudicial foreclosure was unlawful. Thus, the conclusions of law of the circuit court in its Trial Order-- that Tanaka "complied with the applicable foreclosure statutes," that the Santiagos "did not establish any defense to foreclosure," and that the Santiagos' "'power of sale' argument is meritless"--are incorrect.

## 2. The Right to Cure

The Santiagos have asserted that there is a statutory right to cure default under HRS § 667-5 and that, pursuant to that statutory right, they cured any default under the Mortgage, making the ensuing foreclosure wrongful. When construing a statute, courts are bound to give effect to all parts of a statute, and no clause, sentence, or word shall be construed as "superfluous, void, or insignificant" if a construction can be legitimately found that will give force to and preserve all words of the statute. Fagaragan v. State, 132 Hawai'i 224, 241, 320 P.3d 889, 906 (2014).

HRS § 667-5(c) provides that "[u]pon the request of any person entitled to notice . . . the mortgagee . . . shall disclose to the requestor . . . the amount to cure the default

. . . ." Thus, subsection (c) clearly imposes certain disclosure requirements on the mortgagee intending to foreclose. The fact that, upon the mortgagor's request, the mortgagee must disclose the amount to cure the default, together with the related obligation to disclose such amount before the auction sale, implies a right of the defaulting party to cure in order to prevent foreclosure. Construing HRS § 667-5(c) as not providing a right to cure would essentially render meaningless the express statutory requirement that "[t]he amount to cure the default" be disclosed upon a mortgagor's request. Under such a construction, the requirement that a mortgagee should disclose the amount to cure would be superfluous, since that requirement would have no practical application if there were no predicate right to cure. Viewed another way, it is plainly illogical to have a statutory requirement mandating disclosure of the amount to cure if, in actuality, there is no statutory right to cure. See HRS § 667-5(c) (utilizing the word "shall" to signify an imperative command instead of the permissive modal verb "may").

Additionally, unlike a power of sale, which HRS § 667-5 explicitly required to be "contained in a mortgage," the amount to cure that a mortgagee must disclose upon the mortgagor's request was not statutorily required to have an independent contractual source. If the legislature intended a

52

right to cure to be agreed upon contractually, it could have added to HRS § 667-5(c)(1) the qualifier "when contained in a mortgage," as it did in the power of sale provision. The absence of such a qualifier is supportive of the interpretation that the right to cure is statutorily provided by HRS § 667-5(c)(1).

Finally, our interpretation is consonant with HRS § 677-5(c)'s codification of the common-law right to cure a default. The purpose that prompted the addition of HRS § 667-5(c) to the foreclosure statute in 2008 was to "ensure that the different nonjudicial foreclosure processes include provisions for interested parties to receive sufficient notice and obtain information about the intent to foreclose [and] amounts to cure the mortgage default." Conf. Comm. Rep. No. 3-08, in 2008 House Journal at 1710, 2008 Senate Journal at 793 (emphases added). Evident from the legislative history of HRS § 667-5(c) is the recognition that the right to cure a default is intrinsic in the law and that, therefore, HRS § 677-5(c) merely codified this right to ensure that interested parties were adequately apprised of it.

The common-law right to cure a default originated from the fundamental premise that "[m]ortgage foreclosure is a proceeding equitable in nature and is thus governed by the rules

of equity." Beneficial Haw., Inc. v. Kida, 96 Hawai'i 289, 312, 30 P.3d 895, 918 (2001). Because equity abhors forfeitures, Jenkins v. Wise, 58 Haw. 592, 597, 574 P.2d 1337, 1341 (1978), and "regards and treats as done what ought to be done," Bank of Haw. v. Horwoth, 71 Haw. 204, 211, 787 P.2d 674, 679 (1990), it is typical in foreclosure cases that a right to cure a default and stop the foreclosure continues up to the day of the confirmation of the sale. Hoge v. Kane, 4 Haw. App. 533, 541, 670 P.2d 36, 41 (1983). Thus, Hawaii's courts "would not prevent a mortgagor from curing the default and halting the foreclosure prior to the entry of a written order confirming the foreclosure sale." In re Parish, No. 10-00086, 2010 WL 1372387, at *1 (Bankr. D. Haw. Apr. 6, 2010) (emphasis added); see also Graf v. Hope Bldg. Corp., 171 N.E. 884 (N.Y. 1930) (Cardozo, J., dissenting) ("Equity declines to give effect to a covenant, however formal, whereby in the making of a mortgage, the mortgagor abjures and surrenders the privilege of redemption.").[36] Accordingly, our interpretation that HRS § 667-5(c) provides a right to cure is directed by HRS § 667-5(c)'s codification of the same right under the common law. To hold

---

[36] Federal law recognizes an equitable right of redemption and cure. In re Parish, 2010 WL 1372387, at *1 ("The right of redemption is an equitable interest that is included in the bankruptcy estate under section 541(a)(1).").

otherwise would be to disregard the emanating purpose of HRS § 667-5(c) and to indirectly nullify the common-law right to cure as incorporated in HRS § 667-5(c).[37]

### 3. The Santiagos Cured the Default, and Tanaka's Nonjudicial Foreclosure was Wrongful

Based on the statutory right provided in HRS § 667-5, the Santiagos had a right to cure the default occasioned by their non-payment.  Thus, the circuit court's conclusion of law that there is no right to cure in Hawai'i law is incorrect.

Although the Santiagos indicated on March 10, 2008, that they were halting payment to the mortgage servicer based on concerns regarding mediation, they were continuing to set aside payment.  The record further indicates that the Santiagos cured any event of default as of May 8, 2008, some four months prior to the sale.

Default is a necessary precondition for nonjudicial foreclosure under HRS § 667-5.  Lee, 121 Hawai'i at 290, 218 P.3d at 778 ("This section specifically requires breach of a condition of the mortgage as a condition precedent to

---

[37]    The circuit court's citation to Weinberg v. Mauch, 78 Hawai'i 40, 52, 890 P.2d 277, 289 (1995), for the proposition that there is no "right to cure" is incorrect.  That case is inapposite because it did not concern a statutory or common-law right to cure but only whether an assignment of a right to cure was consented to in the contract.

foreclosure.") Lee found that a sale pursuant to HRS § 667-5 was invalid where a breach of a mortgage contract had been cured because, in that instance, the mortgagors "were no longer in breach of a condition of the mortgage" and, thus, the mortgagee "could not invoke the mortgage's power of sale clause." Id. at 291, 218 P.3d at 779. A foreclosure sale conducted when the default had already been cured, according to Lee, "did not comply with the requirements of HRS section 667-5 and was, thus, invalid." Id. at 291, 218 P.3d at 779 (emphasis added).

Accordingly, since Tanaka's foreclosure was conducted after the Santiagos had cured their default, the sale pursuant to HRS § 667-5 was unlawful, and the circuit court's conclusion that Tanaka "complied with the applicable foreclosure statutes" was incorrect.[38] It was also incorrect for the circuit court to conclude that Tanaka was "entitled to a writ of ejectment."

## C.   The Santiagos' Damages

Where it is determined that the nonjudicial foreclosure of a property is wrongful, the sale of the property

---

[38]    The Santiagos argue that the circuit court should have granted their Motion for Reconsideration because its decision "resulted in an over $1.3 million cash forfeiture as a result of [the Santiagos'] purchase of the subject property and their full performance" under the Mortgage. In light of our disposition of this case, it is unnecessary to reach this argument.

is invalid and voidable at the election of the mortgagor, who shall then regain title to and possession of the property. See Ulrich v. Sec. Inv. Co., 35 Haw. 158, 168 (1939) (holding that where a self-dealing mortgagee fails to exercise its right to non-judicial foreclosure in a manner that is fair, reasonably diligent, and in good faith and to demonstrate that an adequate price was procured for the property, the resulting sale is void); Lee v. HSBC Bank USA, 121 Hawai'i 287, 292, 218 P.3d 775, 780 (2009) (concluding "that an agreement created at a foreclosure sale conducted pursuant to HRS section 667-5 is void and unenforceable where the foreclosure sale is invalid under the statute"). Voiding the foreclosure sale at this time, however, has been rendered impracticable because the Tavern has already been resold by Tanaka to a third party. See 123 Am. Jur. Proof of Facts 3d § 31 (2011) ("It has long been held that if the property has passed into the hands of an innocent purchaser for value, an action at law for damages is generally the appropriate remedy."). Thus, based on our power to fashion an equitable relief in foreclosure cases, see Beneficial Haw., Inc. v. Kida, 96 Hawai'i 289, 312, 30 P.3d 895, 918 (2001) (reiterating that mortgage foreclosure is a proceeding equitable in nature), we consider appropriate relief.

Jenkins v. Wise, 58 Haw. 592, 574 P.2d 1337 (1978), is instructive. In that case, even though this court found the purchaser to be in default, we disapproved of the circuit court's disposition that essentially effectuated a total forfeiture of the purchaser's interest, in part because the seller's "security interests in the property were never in jeopardy." Id. at 598, 574 P.2d at 1342. In this context, the court found that "where no injustice would thereby result to the injured party, equity will generally favor compensation rather than forfeiture against the offending party." Id. at 597, 574 P.2d at 1341. Thus, instead of cancelling the purchase contract and depriving the purchaser of the property and the significant amount of money that she already paid, this court ordered the purchaser of the property to pay the seller the entire unpaid balance of the purchase price and accrued interests in exchange for specific performance by the seller under the purchase contract. Id. at 604, 574 P.2d at 1345.

Similar to Jenkins, Tanaka's security interests in the Tavern were never in jeopardy. At the time of their ejectment, the Santiagos had made virtually full payment to Tanaka for the Tavern, including an $800,000 down payment and $585,161.60 in mortgage payments. Hence, we exercise our equitable power in awarding restitution to the Santiagos so as to prevent

58

forfeiture of their interests.  Accordingly, we conclude that the Santiagos are entitled to restitution of their proven out-of-pocket losses from Tanaka's wrongful foreclosure of the Mortgage and subsequent sale of the Tavern.  See Fleming v. Napili Kai, Ltd., 50 Haw. 66, 70, 430 P.2d 316, 319 (1967) (declaring that equity jurisprudence "is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life" (quoting Bowen v. Hockley, 71 F.2d 781, 786 (4th Cir. 1934)).  This amount is equal to the undisputed $800,000 down payment that the Santiagos paid for the Tavern, $585,161.60 in mortgage payments from September 2006 to March 2011, consisting of principal, interest, and fees, $17,518.31 that the Santiagos were required to pay in closing charges associated with the sale, and $10,110.88 in property taxes that the Santiagos paid after Tanaka had wrongfully sold the Tavern back to herself.[39]  In sum, the Santiagos suffered total out-of-pocket losses of

---

[39]    The Santiagos suggested to both the circuit court and the ICA that Tanaka's "actual damages," which they estimated at $80,335, should be deducted from their gross damages.  This deduction proceeded upon the premise that the nonjudicial foreclosure was valid and that the purchase price at the foreclosure sale would be $1.3 million.  Because both assumptions are incorrect, the proposed deduction is not applicable.

$1,412,790.79 as a result of Tanaka's wrongful foreclosure of the Mortgage and subsequent sale of the Tavern.[40]

In cases involving fraud or deceit, which includes nondisclosure claims, this court has previously stated that the measure of damages "is usually confined to either the 'out-of-pocket' loss or the 'benefit of the bargain.'" Ellis v. Crockett, 51 Haw. 45, 53, 451 P.2d 814, 820 (1969); Zanakis-Pico v. Cutter Dodge, Inc., 98 Hawai'i 309, 320, 47 P.3d 1222, 1233 (2002) (same). Under the out-of-pocket rule, "the damages are the difference between the actual value of the property received and the price paid for the property, along with any special damages naturally and proximately caused by the fraud prior to its discovery, including expenses incurred in mitigating the damages." B.F. Goodrich Co. v. Mesabi Tire Co., 430 N.W.2d 180, 182 (Minn. 1988); see generally 37 Am. Jur. 2d Fraud and Deceit § 434 (2013). In contrast, the benefit-of-the-bargain rule "allows the [recipient of the fraud or deceit] to recover the

---

[40] Relatedly, because unlawful foreclosure is an action in the nature of assumpsit, see Sharp v. Hui Wahine, Inc., 49 Haw. 241, 243, 413 P.2d 242, 245 (1966), the Santiagos, who should have been the prevailing parties, are also entitled to attorneys' fees and costs they incurred at the circuit court. HRS § 607-14 (Supp. 1997). Conversely, because Tanaka should have been the losing party, the circuit court's award of attorneys' fees and costs to her, based on HRS § 607-14, is erroneous. We therefore remand this case to the circuit court for a determination of the amount of attorneys' fees and costs due the Santiagos.

difference between the value of the property received and the value to plaintiff that the property would have had if the representation had been true."  Id.; see generally 37 Am. Jur. 2d Fraud and Deceit § 432 (2013).[41]  It is unnecessary to decide the applicable measure of nondisclosure damages due the Santiagos because, based on the trial record, the total amount of damages to which the Santiagos are entitled on their nondisclosure claim is included within the $1,412,790.79 amount that this court has already awarded to them.

With respect to damages for negligent misrepresentation, the Santiagos "may recover the pecuniary losses caused by their justifiable reliance on a negligent misrepresentation."  Zanakis-Pico, 98 Hawai'i at 321, 47 P.3d at 1234 (citing State ex rel. Bronster v. U.S. Steel Corp., 82 Hawai'i 32, 919 P.2d 294 (1996) (recognizing that "pecuniary losses are recoverable in a claim for negligent misrepresentation")); see Chun v. Park, 51 Haw. 462, 468, 462

---

[41]     Inherent in the foregoing formulations is the presupposition that the recipient of fraud or deceit retains some value as a result of the transaction in which the fraud or deceit was made.  Where the recipient of fraud or deceit is left with no value whatsoever, the proper measure of damages is "the amount . . . paid with interest from the date of payment, plus incidental losses and expenses suffered as a result of the seller's misrepresentations."  Salmon v. Brookshire, 301 S.W.2d 48, 54 (Mo. Ct. App. 1957); accord Kerr v. Vatterott Educ. Ctrs., Inc., 439 S.W.3d 802, 813-14 (Mo. Ct. App. 2014); see Anderson v. Heasley, 148 P. 738 (Kan. 1915).

P.2d 905, 909 (1969) (approving "out of pocket" expenses incurred in connection with the purchase of a property in reliance upon a negligent misrepresentation).  The Zanakis court adopted the following formulation from the Restatement (Second) of Torts for damages recoverable for a negligent misrepresentation:

> [T]hose damages necessary to compensate the plaintiff for the pecuniary loss to him or her of which the misrepresentation is a legal cause, including
>
> (a) the difference between the value of what he or she has received in the transaction and its purchase price or other value given for it; and
>
> (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

Zanakis-Pico, 98 Hawai'i at 322, 47 P.3d at 1235 (2002) (alterations and emphasis omitted) (quoting Restatement (Second) of Torts § 552B (1977)).  Although the Santiagos are entitled to damages for negligent misrepresentation, similar to the damages for nondisclosure, we need not decide the applicable amount due the Santiagos because based on the trial record, the total amount of damages to which the Santiagos are entitled on their negligent misrepresentation claim is included within the $1,412,790.79 amount that they have already been awarded.

## VI.    Conclusion

Based on the foregoing, we vacate the ICA Judgment on Appeal and the circuit court's Judgment, Writ of Ejectment,

Order Denying the Santiagos' Motion for Reconsideration, and Order Granting Tanaka's Fees. The circuit court's Trial Order, which incorporates the FOF and COL, is vacated insofar as it is inconsistent with this opinion; otherwise, it is affirmed. The case is remanded to the circuit court (1) for entry of judgment in favor of the Santiagos on their negligent misrepresentation and nondisclosure causes of action; (2) for entry of judgment in favor of the Santiagos on Tanaka's breach of note, breach of mortgage, breach of covenant of good faith and fair dealing, and ejectment causes of action; and (3) for determination of interest, attorneys' fees, and costs in favor of the Santiagos, as appropriate.

| | |
|---|---|
| Gary Victor Dubin and Frederick J. Arensmeyer for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Robert Goldberg for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

