*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-13-0002610
01-NOV-2016
09:45 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

GERALD K. MOUNT, JR. and JANE R. MOUNT,
Respondents/Plaintiffs/Counterclaim Defendants/Appellees,
vs.
MARGARET APAO,
Petitioner/Defendant/Appellant,
and
DIRK APAO as Co-Personal Representative of the
ESTATE OF ROSE MARIE ALVARO, deceased,
Petitioner/Defendant/Counterclaim Plaintiff/
Third-Party Plaintiff/Appellant,
and
SESHA LOVELACE, as Co-Personal Representative of the
ESTATE OF ROSE MARIE ALVARO, deceased,
Petitioner/Defendant/Cross-Claim Defendant/Appellee,
and
U.S. BANK NATIONAL ASSOCIATION, A NATIONAL ASSOCIATION AS
TRUSTEE FOR THE STRUCTURED ASSET SECURITIES CORPORATION
MORTGAGE PASS-THROUGH CERTIFICATES 2005-SC1,
Respondent/Third-Party Defendant/Cross-Claim Plaintiff/Appellee.

SCWC-13-0002977, SCWC-13-0002610
and SCWC-14-0000556

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0002977, CAAP-13-0002610, and CAAP-14-0000556;
CIV. NO. 11-1-2005)

NOVEMBER 1, 2016

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.   Introduction

This consolidated appeal arises from an ejectment action initiated after a nonjudicial foreclosure on real property pursuant to Hawaiʻi Revised Statutes ("HRS") § 667-5 (Supp. 2008), which was repealed in 2012.[1]  The Circuit Court of the First Circuit ("circuit court") entered a Final Judgment in favor of Gerald Mount Jr. and Jane R. Mount ("the Mounts"), purchasers of the property through the nonjudicial foreclosure sale, and mortgagee U.S. Bank National Association, a National Association as Trustee for Structured Asset Securities Corp. Mortgage Pass-Through Certificates, Series 2005-SC1 ("U.S. Bank").  The Final Judgment was entered against Margaret Apao ("Margaret"), sister of decedent Rose Marie Alvaro ("Alvaro"), and Dirk Apao, Margaret's son, as personal representative of Alvaro's estate ("Dirk") (Margaret and Dirk are sometimes collectively referred to as "the Apaos").

With respect to the issues we address on certiorari, the circuit court ruled that a nonjudicial foreclosure conducted pursuant to HRS § 667-5 is a "proceeding to enforce a mortgage" under HRS § 560:3-803(d)(1), exempt from the time limits for presentation of claims against a decedent's estate, set out by

---

[1]   HRS § 667-5 was in Part I of chapter 667 and was repealed by the legislature in 2012.  2012 Haw. Sess. Laws Act 182, § 50 at 684.

2

other subsections of HRS § 560:3-803.  The circuit court also ruled that U.S. Bank did not violate HRS § 667-5(c)(1) by failing to provide Dirk's former co-personal representative Sesha Lovelace ("Lovelace") with information she had requested regarding the funds that would be required to reinstate the loan and thereby cure the default ("reinstatement figures").  The Intermediate Court of Appeals ("ICA") affirmed.

The Apaos raise various issues on certiorari, including the following:

> 1.   Is a nonjudicial mortgage foreclosure under HRS § 667-5 a "proceeding to enforce a mortgage" under HRS § 560:3-803(d)(1), and if not, did U.S. Bank fail to comply with HRS § 560:3-803(c)'s requirements for presentation of claims, thereby barring its claims?
>
> 2.   Was the nonjudicial foreclosure conducted in violation of HRS § 667-5(c)(1), when U.S. Bank failed to provide Lovelace with loan reinstatement figures?

With respect to the first issue, we hold that a nonjudicial mortgage foreclosure conducted pursuant to HRS § 667-5 is not a "proceeding to enforce a mortgage" under HRS § 560-3-803(d)(1).  Therefore, a nonjudicial foreclosure conducted pursuant to HRS § 667-5 is not exempt from the time limits under HRS § 560:3-803 for presentation of claims against a decedent's estate.[2]

_____

[2]   HRS § 560-3-803(c), the subsection at issue in this case, provides in relevant part:

> (c)   All claims against a decedent's estate which arise at or after the death of the decedent [] are barred []unless presented as follows:
>
> (continued. . .)

With respect to the second issue, we hold that U.S. Bank's failure to provide reinstatement figures to Lovelace violated HRS § 667-5(c)(1)'s requirement that "[u]pon the request of any person entitled to notice, the attorney [or] the mortgagee . . . shall disclose to the requestor . . . information . . . [regarding] the amount to cure the default. . . ."  We further hold that this failure rendered the nonjudicial foreclosure sale voidable at the Estate's election, unless the Mounts are innocent purchasers for value; if the Mounts are innocent purchasers for value, then the circuit court must determine an appropriate remedy, which generally would be an award of damages.  Santiago v. Tanaka, 137 Hawai'i 137, 158, 366 P.3d 612, 633 (2016) (holding that where the nonjudicial foreclosure of a property is wrongful, the sale of the property is invalid and voidable at the election of the mortgagor, who shall then regain title to and possession of the property, except where the property has passed into the hands of an innocent purchaser for value, under which circumstances, an action at law for damages is generally the appropriate remedy).

---

(. . .continued)
                    . . . .
              (2) . . .  [W]ithin the later of four months after it
          arises . . . .

Our resolution of the second issue resolves the Apaos' remaining four issues on certiorari, which we therefore do not address.[3]

Accordingly, we vacate the ICA's Judgment on Appeal and the circuit court's Final Judgment along with all the orders, writs, and/or judgments referenced in the Final Judgment, and we remand the case to the circuit court for further proceedings consistent with this opinion.

## II.   Background

### A.   The Estate and the Nonjudicial Foreclosure Proceeding

In 1999, Alvaro obtained a loan for $500,000, secured by a mortgage ("the Mortgage") and promissory note ("the Note") on the subject real property located on the slopes of Diamond Head at 2979 Makalei Place, Honolulu, Hawaiʻi 96815 ("the Property").[4] The Property was appraised in 2013 to have a fair market value of $3,535,000.

---

[3]   Issues 3 through 6 on certiorari concerned whether: (3) the entry of the writ of possession prior to a separate, final judgment resulted in an unlawful splitting of the ejectment claim in violation of this court's Separate Judgment Rule; (4) the award of attorneys' fees and costs was erroneous because this case was not an action in the nature of assumpsit; (5) the damages award based in part on the amount the Mounts paid to rent an alternate property was clearly erroneous; and (6) the supplemental damages award for actual costs incurred in carrying out the eviction was erroneous.

[4]   An assignment of Mortgage from Fremont Investment & Loan, the original mortgagee, to Mortgage Electronic Registration Systems, Inc. as nominee for First Union National Bank ("MERS") was recorded on August 30, 2001, and, a second assignment from MERS to U.S. Bank was recorded on December 17, 2009.

Alvaro passed away on December 18, 2002. On January 23, 2003, a petition seeking informal probate of her will and for appointment of personal representatives was filed with the probate court in In the Matter of the Estate of Rose Marie Alvaro ("the Estate"), Probate Case No. 03-1-0018. Margaret and Dirk were appointed co-personal representatives of the Estate. A death certificate was filed in the informal probate proceeding.

Margaret and Dirk apparently did not notify U.S. Bank or its mortgage servicer, American Home Mortgage Servicing, Inc. ("AHMS"), of Alvaro's death, but began making payments on the Note with the Estate's funds. The Note apparently went into arrears around November of 2004. A notice of Alvaro's death and regarding the informal appointment of Margaret and Dirk as co-personal representatives in an unsupervised administration was published in the Honolulu Star-Bulletin on three dates in May 2005. The notice did not notify creditors of any deadlines to present their claims.

Margaret apparently began living at the Property and collecting the mail in 2006 or 2007. By an order entered on July 11, 2007, the informal probate was converted to a formal probate proceeding. Dirk and Margaret remained as co-personal representatives.

Letters asserting default under the Note, addressed to Alvaro, were mailed to the Property in 2008 and 2009; Margaret disputed receiving them.  By March 1, 2009, the Note was clearly in default.  AHMS sent a letter addressed to Alvaro dated April 16, 2009 ("Default Notice").  The Default Notice provided the amount to cure the default, $11,606.14, and stated that the loan would be accelerated if not cured within 30 days.

Five months later, on August 5, 2009, Lovelace, as an Estate beneficiary, petitioned the probate court to remove Margaret and Dirk as co-personal representatives.  She alleged a conflict of interest between the Apaos and the Estate because they had been living on the Property rent-free for years.  Lovelace also asserted:

> The current personal representatives would appear to have neglected their duties by failing to process this matter expeditiously. . . . Also, the Estate may owe additional penalties and taxes since the tax returns have not been filed on time.  The estate may have claims against the current personal representatives for a surcharge.  The current personal representatives are not in a position to handle fairly any such claims that the estate has against them.

By the end of 2009, U.S. Bank was clearly aware of Alvaro's death.  On December 14, 2009, the law firm of Routh Crabtree Olson ("Routh Crabtree"), as counsel for U.S. Bank, sent a "Notice Under Fair Debt Collection Practices Act" to the "Heirs and/or Devisees of Rose Marie Alvaro," stating it had been retained to initiate foreclosure proceedings.

On February 1, 2010, U.S. Bank recorded a Notice of Mortgagee's Intent to Foreclose Under Power of Sale ("Notice of Intent to Foreclose") in the Hawaiʻi Bureau of Conveyances, setting an auction date of April 1, 2010.  According to Routh Crabtree, the Notice of Intent to Foreclose was forwarded to all parties who had recorded encumbrances, liens and/or other claims against the Property.  These parties included the "Heirs and/or Devisees of Rose Marie Alvaro," "Dirk Apao Personal Representative for Rose Marie Alvaro," and "Sesha Lovelace," apparently in her personal capacity as a beneficiary of the Estate.

Later that month, pursuant to an order filed February 23, 2010, Lovelace's petition to remove the personal representatives was partially granted by the probate court, and Lovelace was substituted as a co-personal representative in place of Margaret to serve with Dirk.  This change in co-personal representatives was handwritten on a document entitled "Second Amended Letters Testamentary," on which Margaret's name was crossed out and Lovelace's name was written above, and which was signed and certified by the clerk of the probate court.[5]

Although U.S. Bank was aware of Alvaro's death, it continued to send correspondence addressed to Alvaro to the Property, which Margaret apparently received.  Then, despite the

---

[5]     Hawaiʻi Probate Rules Rule 48 pertains to the "Delegation of Powers to Clerk and Deputy Clerks."  The fact that the letters were signed by the clerk and not the judge is not raised as an issue in this case.

order two days earlier officially removing her as a co-personal representative, on February 25, 2010, Margaret, claiming to be Alvaro, called AMHS and obtained a verbal reinstatement quote of $72,645.42, valid until March 3, 2010,  which AHMS confirmed by a letter of the same date addressed to Alvaro and mailed to the Property.  The following day, March 31, 2010, Margaret faxed this reinstatement amount and mortgage balance to Dirk.

The day before, on March 30, 2010, Margaret had called AHMS again, asking for an updated reinstatement quote, first pretending to be Alvaro and then claiming to be a personal representative of the Estate.  It appears that in order to establish her authorization to receive loan information, pursuant to AHMS's request, Margaret faxed the first page of the July 11, 2007 probate court's "Order Granting Petition to Transfer from Informal to Formal Proceeding and to Renew Letters Testamentary," which had continued her and Dirk as co-personal representatives.

U.S. Bank postponed the foreclosure sale scheduled for April 1, 2010.  On April 19, 2010, AHMS mailed updated reinstatement figures to Margaret, reflecting a reinstatement amount totalling $80,138.32, which she appears to have also forwarded to Dirk.

Ten months later, on February 3, 2011, U.S. Bank officially served the original Notice of Intent to Foreclose on Lovelace as

"as personal representative."  It also served Dirk "as personal representative" on February 5, 2011.  This notice still reflected the foreclosure sale date of April 1, 2010, which had already passed.

In any event, pursuant to the Notice of Intent to Foreclose, which directed inquiries to AHMS, Lovelace began requesting reinstatement figures soon after she was served.  Although Routh Crabtree had served Lovelace with the Notice of Intent to Foreclose as a personal representative, AHMS questioned Lovelace's authority to receive the reinstatement figures.  Based on emails between Lovelace and her attorney, it appears that on February 9, 2011, her attorney faxed to AHMS the Second Amended Letters Testamentary of February 23, 2010.  On February 18, 2011, Lovelace emailed her attorney, however, stating, "The company will not accept this document because it doesn't appear to be original with the names scratched out and hand written in.  Is there another copy that is more professional and credible?"  Lovelace also emailed her attorney that she was attempting to obtain the mortgage account number from Dirk because "[t]hey will not provide any information without [it]."  Lovelace made the following request to her attorney:

> Let me know once the documentation is faxed to American Home Mortgaging so I can follow-up with a phone call to determine the specifics on what is happening with [the Property]. I want to know exactly what we owe and how long

they have been extending the issue before we make a final decision. I am concerned that the 6 month extention [sic] for the $250,000 would set us up for failure if [the Property] is foreclosed on.

On February 23, 2011, Lovelace sent a follow-up email to Routh Crabtree. The next day, Routh Crabtree billing assistant Julie Cihak ("Cihak") responded to Lovelace's email, stating, "I need the borrower to send in a signed auth [sic] for us to give you the figures, also I have requested the reinstatement figures 3 times and they have only supplied payoff figures I have requested again."

AHMS mailed two payoff statements dated February 19 and 24, 2011 to the Property, reflecting payoff amounts of $567,635.26 and $573,146.86. Margaret forwarded at least one of them to Dirk.

On March 2, 2011, Lovelace provided the Estate account number to Cihak. On March 3, 2011, Cihak responded that AHMS still had not provided the reinstatement figures to her, but that she would send them to Lovelace as soon as they did. In addition, Routh Crabtee foreclosure analyst Candice Yoo ("Yoo") emailed Lovelace to ask if she had received her quote and stated, "It looks like the sale is still set for 3-7-11. I believe our fees and costs department have been working on obtaining a reinstatement quote for you." Lovelace responded that she had not received the figures, and that "AHMSI is insisting that the auction is not scheduled because our property

11

is not listed on their website.  Can I trust that this is true? They are also saying that [Routh Crabtree] is a third party and does not have the most updated information."

Yoo responded the following day, March 3, 2011, to explain that the "sale is still scheduled for 3-7-11, but I am having the sale postponed for two weeks for your reinstatement quote." On March 7, 2011, Yoo informed Lovelace that the sale had been postponed to March 21, 2011, and asked if she had received the quote, to which Lovelace replied that she had not.

On or about March 7, 2011, AHMS apparently posted a reinstatement quote to LPS, a service that lenders and their attorneys use to facilitate communications between each other. According to this reinstatement quote, the reinstatement figure as of March 7, 2011 was $145,486.69. According to AHMS, this reinstatement quote was intended to be released to Lovelace "if and when she provided the required authorization."

Neither Lovelace, Margaret, or Dirk ever received reinstatement figures at any time after April 2010, despite assurances to Lovelace that the March 7, 2011 continued foreclosure sale was being postponed in order to provide her with those figures.  Despite these assurances, U.S. Bank conducted a foreclosure auction on April 4, 2011.  At the

auction, the Mounts purchased the Property through their company, Fair Horizon LLC,[6] for approximately $1.21 million.

On April 6, 2011, Lovelace emailed Cihak to state that she had not received the reinstatement information, but that the Property had been sold.  On April 7, 2011, Routh Crabtree lead foreclosure analyst Monica Woodward told Lovelace that "Julie Cihak no longer works on Hawaii files[,]" and invited her to call regarding questions.  On April 10, 2011, Lovelace emailed her attorney regarding her conversation with Woodward, stating, "[Woodward] explained to me that the lender would not accept the document in question which is why I never received the reinstatement amount.  She emphasized that even though [Routh Crabtree] forwarded them the same document they wouldn't accept it as reliable because of the handwritten notes."

Thus, U.S. Bank failed to provide Lovelace reinstatement figures, alleging she had failed to provide sufficient evidence of her status as a personal representative, despite having served her on February 3, 2011 with the Notice of Intent to Foreclose specifically identifying her as a personal representative of the Estate.

---

[6]    The Mounts were identified as the nominee for Fair Horizon LLC.

**B.    The Mounts' Ejectment Action Against the Apaos**

The Mounts received a limited warranty deed to the Property from U.S. Bank, which was recorded on July 22, 2011.  On September 7, 2011, the Mounts filed a Complaint in the circuit court against Margaret individually and Dirk and Lovelace as co-personal representatives, asserting claims for ejectment (Count I) and quiet title (Count II)("Complaint").

On October 11, 2011, the Apaos filed a joint answer, asserting that the nonjudicial foreclosure and sale were illegal and void.  Dirk also filed a "Counterclaim and Third-Party Complaint for Wrongful Foreclosure, Quiet Title, and Damages" against the Mounts and U.S. Bank for violation of the Probate Code, HRS § 560:3-803 (Count I), violation of HRS § 667-5 (Count II), violation of the Mortgage (Count III), and defective and fraudulent transfer of the Mortgage (Count IV) ("Counterclaim and Third-Party Complaint").  On October 31, 2011, Lovelace filed an answer alleging invalidity of the foreclosure sale and incorporating by reference the Apaos' pleadings.

On May 16, 2012, Lovelace filed a motion to substitute Dirk or, in the alternative, to dismiss any and all claims by and against her pursuant to a "Stipulated Settlement and Release Agreement and Order" filed in the probate court proceeding on November 23, 2011 ("Stipulated Settlement").  The Stipulated

Settlement allowed Lovelace to resign as a co-personal representative, but also required her to cooperate and assist the Estate in its defense of the ejectment and foreclosure proceedings involving the Property.[7] Although the circuit court[8] denied Lovelace's motion by order dated August 8, 2012, claims against Lovelace were later dismissed by stipulation.

The Mounts and the Apaos filed various cross-motions for summary judgment on the Complaint, Counterclaim, and Third Party Complaint.[9] A consolidated hearing on the various motions was held on May 21, 2013. The circuit court first ruled that HRS § 560:3-803(d)(1) exempted any proceeding to enforce a mortgage

---

[7] Pursuant to the Stipulated Settlement, the named beneficiaries of Alvaro's will agreed to an interim partial distribution of the assets of the Estate." As part of the interim partial distribution, the Lovelace family received two apartment units owned by the Estate, $100,000 in cash paid to her attorney-client trust account, and a guarantee that the Estate would perform its obligations, including the payment of taxes. In exchange, the parties agreed to "waive and release any and all claims relating to the Estate and/or to any assets of the Estate against the Estate and against each other, including any claims that any of the Parties failed to perform any duties owed to the Estate or to each other as Beneficiaries or Co-Personal Representatives . . . ."

[8] The Honorable Karen T. Nakasone presided over the circuit court proceedings.

[9] With respect to their Complaint, the Mounts filed motions for (1) summary judgment on Count I for ejectment, and (2) partial summary judgment on the Count II for quiet title regarding (a) their status as bona fide purchasers for value, and (b) the validity of the nonjudicial foreclosure sale. The Mounts also filed a motion for summary judgment on the Counterclaim in its entirety. With respect to the Apaos' Third-Party Complaint, U.S. Bank filed a motion for partial summary judgment on Count I alleging a violation of HRS § 560:3-803's presentation of claim requirement and Count IV alleging defective and fraudulent transfer of the Mortgage. Count IV was thereafter dismissed by stipulation. U.S. Bank also filed a substantive joinder in the Mounts' motion for partial summary judgment as to Count II (quiet title) of their Complaint. The Apaos filed motions for (1) summary judgment on the Mounts' complaint, and (2) partial summary judgment on the Counterclaim and Third-Party Complaint as to wrongful foreclosure and quiet title.

15

from presentation of claims requirements, and that a nonjudicial foreclosure is such a "proceeding" under HRS § 560:1-201.  The circuit court also ruled that HRS § 667-5(c)(1) was not violated because Lovelace failed to establish her entitlement to the reinstatement figures, and that, therefore, the foreclosure sale was valid.  The circuit court alternatively ruled that even if HRS § 667-5 had been triggered, U.S. Bank had complied with the requirement to provide the amount to cure because Dirk had received reinstatement figures through Margaret.  Based on its ruling that the foreclosure sale was valid, the circuit court granted the Mounts and U.S. Bank partial summary judgment quieting title, granted the Mounts summary judgment on their ejectment claim and on the Counterclaim, and denied the Apaos' cross-motions for summary judgment on the Complaint and for partial summary judgment on the Counterclaim and Third-Party Complaint.  In light of its ruling, the circuit court deemed moot the Mounts' motion for partial summary judgment alleging bona fide purchaser status, and the Mounts withdrew that motion. These rulings were memorialized in orders filed on July 25 and 26, 2013.

The circuit court entered a writ of ejectment on July 25, 2013, granting the Mounts possession of the Property.  Four days later, the circuit court entered a Judgment, reserving the issue of the Mounts' alleged damages.

On August 6, 2013, the Apaos appealed the July 29, 2013 Judgment, as well as the orders (1) granting the Mounts summary judgment as to Count II of the Complaint and U.S. Bank's joinder, (2) granting the Mounts summary judgment as to Count I of the Complaint, (3) granting the Mounts summary judgment as to the Counterclaim, (4) denying the Apaos summary judgment as to the Complaint and partial summary judgment on the Counterclaim and Third-Party Complaint, (5) denying the Apaos' request for judicial notice of their motion to dismiss filed in the district court, and (6) granting U.S. Bank partial summary judgment on Counts I and IV of the Third-Party Complaint.  This appeal initiated CAAP-13-2610.  On August 9, 2013, the Apaos were apparently served with a writ of execution, and were informed that they had 48 hours to vacate the property.  The Apaos appealed the Writ of Possession on August 22, 2013, initiating CAAP-13-2977.  After a hearing on the Mounts' request for damages, the circuit court awarded the Mounts damages against the Apaos in the amount of $237,504.81 as well as attorneys' fees and costs in the amount of $208,592.23.  The circuit court also awarded U.S. Bank attorneys' fees and costs of $175,423.45.  On March 13, 2014, the circuit court entered a Final Judgment reflecting its various rulings.  The Apaos appealed the circuit court's Final Judgment, initiating CAAP-14-556

## C.    Appeal to the ICA

The ICA consolidated the three appeals (CAAP-13-2610, CAAP-13-2977, and CAAP-14-556) under CAAP-13-2977 by orders dated November 13, 2013 and November 18, 2014.

With respect to the issues on certiorari, the Apaos' first point of error argued that the circuit court erred in granting judgment in favor of the Mounts and U.S. Bank and against the Apaos because the nonjudicial foreclosure was conducted in violation of (1) the Hawaiʻi Probate Code, because U.S. Bank failed to make a proper claim against the Estate by raising it in the probate case or filing a judicial foreclosure action, and (2) HRS § 667-5, because reinstatement information was not provided to Lovelace after her request.[10]

The ICA rejected the Apaos' points of error as "without merit."  Mount, SDO at 4.  First, the ICA affirmed the circuit

---

[10]    The Apaos presented four additional points of error, arguing that (1) the award of attorneys' fees and costs to U.S. Bank and the Mounts was erroneous because this case was not an action in the nature of assumpsit; (2) the circuit court erred in entering the writ without first entering a separate judgment, and further, that its July 29, 2013 judgment violates the Separate Judgment Rule, resulting in an unlawful splitting of the ejectment claim; (3) the award of damages was clearly erroneous and inequitable where the Mounts failed to timely file their request, were not entitled to damages based on their rental of another unidentified property, and received a windfall from the extremely low sale price, and the dispute was not in the nature of assumpsit; and (4) the award of supplemental damages was clearly erroneous.

The ICA determined that a sixth point of error, that the circuit court abused its discretion in setting an outrageously high supersedeas bond, was waived under Hawaiʻi Rules of Appellate Procedure Rule 28(b)(7) because the Apaos made no argument to support it.  Mount v. Apao, CAAP-13-2977, at 3 n.3 (App. Jan. 9, 2015) (SDO).

18

court's ruling that "[t]he non-judicial foreclosure was an exempt proceeding under HRS § 560:3-803(d)(1) because it was a proceeding to enforce a mortgage." Mount, SDO at 6. Next, with respect to the alleged HRS § 667-5 violation, the ICA ruled that

> U.S. Bank, through American Home Mortgage Servicing (AHMS), provided Alvaro's Estate (Estate) with reinstatement information over the phone with Margaret on February 25, 2010, and by letters dated February 25, 2010 and April 19, 2010 and mailed to the Property where Margaret was residing, and also through two pay-off statements in February 2011, at least one of which Margaret received and shared with Dirk. The fact that Margaret received the information after resigning as co-personal representative (Co-PR) is irrelevant because Margaret misrepresented herself to AHMS as a Co-PR of the Estate and shared the reinstatement information she received with Dirk. Also, U.S. Bank informed Lovelace that it would provide her with the reinstatement information she requested if she could provide U.S. Bank with the Estate's account number and a credible document showing that she was a Co-PR, but Lovelace did not provide U.S. Bank with either. U.S. Bank did not violate HRS § 667-5(a)(2) because it provided the Apaos with reinstatement information, and did not violate HRS § 667-5(c)(1) because Lovelace failed to establish that she was a "person entitled to notice" under HRS § 667-5.

Mount, SDO at 7. The ICA affirmed the circuit court's Final Judgment in favor of the Mounts and U.S. Bank on all claims.

**D.   The Apaos' Application for Writ of Certiorari**

As noted, we address the first two issues raised by the Apaos because they are dispositive of the remaining issues. The Apaos argue that the ICA gravely erred in (1) holding that a nonjudicial mortgage foreclosure conducted under HRS § 667-5 is exempt from the Hawaiʻi Probate Code limitation of claims requirements; (2) affirming the Final Judgment in favor of the Mounts and U.S. Bank and against the Apaos on all claims because

19

the nonjudicial foreclosure was conducted in violation of HRS § 667-5.[11]

## III. Standards of Review

### A.    Statutory Interpretation

> The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which [the appellate] court reviews de novo.  Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.

Sierra Club v. Dep't of Transp., 120 Hawaiʻi 181, 197, 202 P.3d 1226, 1242 (2009) (internal citations omitted).

### B.    Motion for Summary Judgment

> [An appellate] court reviews a trial court's grant of summary judgment de novo.  Oʻahu Transit Servs., Inc. v. Northfield Ins. Co., 107 Hawaiʻi 231, 234, 112 P.3d 717, 720 (2005).  The standard for granting a motion for summary judgment is well settled:
>
> > Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.  The evidence must be viewed in the light most favorable to the non-moving party.  In other words, [the appellate court] must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.
>
> Price v. AIG Hawaiʻi Ins. Co., 107 Hawaiʻi 106, 110, 111 P.3d 1, 5 (2005) (original brackets and citation omitted).

---

[11]    See fn. 3, supra, for a description of the other issues on certiorari, which are not addressed based on our rulings on the first two issues.

Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 104,

176 P.3d 91, 103 (2008).

## IV.  Discussion

**A.   A nonjudicial foreclosure is not a "proceeding to enforce a mortgage" exempt from HRS § 560:3-803, which sets time limitations for the presentation of claims against a decedent's estate.**

In their first question on certiorari, the Apaos assert

that U.S. Bank was prohibited from pursuing its claim because a

HRS § 667-5 nonjudicial foreclosure is not a "proceeding to

enforce a mortgage" exempt from HRS § 560:3-803(c)'s bar against

claims against a decedent's estate not presented within a

prescribed time limit.  The Apaos also assert that U.S. Bank's

claim was not timely filed against the Estate.

HRS § 560:3-803 (1997), provides in relevant part as

follows:

> **§560:3-803  Limitations on presentation of claims.**
>
> (c)    All claims against a decedent's estate which arise at or after the death of the decedent []are barred [] unless presented as follows:
>
> . . . .
>
> (2)  . . . [W]ithin []four months after it arises. . . .
>
> (d)  Nothing in this section affects or prevents:
>
> (1)  Any proceeding to enforce any mortgage, pledge, or other lien upon property of the estate. . . .

Whether a nonjudicial foreclosure conducted pursuant to HRS

§ 667-5 is a "proceeding to enforce a mortgage" under HRS §

21

560:3-803(d)(1) exempt from the presentation of claims time limits reflected in other subsections of HRS § 560:3-803 is a matter of first impression in Hawai'i. Both the circuit court and ICA ruled that a nonjudicial foreclosure conducted pursuant to HRS § 667-5 so qualifies. The Apaos assert that this ruling was in error. For the following reasons, we agree.

According to HRS § 560:1-201, "`Proceeding' includes an action at law or a suit in equity." Black's Law Dictionary defines an "action at law" as "[a] civil suit stating a legal cause of action and seeking only a legal remedy." Black's Law Dictionary 35 (10th ed. 2014). It defines "suit in equity" as "A civil suit stating an equitable claim and asking for an exclusively equitable remedy." Id. at 1663. "Suit" is defined as "[a]ny proceeding . . . in a court of law." Id.

Historically, before the merger of legal and equitable actions, actions at law were triable by a jury, while suits in equity were heard by a judge. Mehau v. Reed, 76 Hawai'i 101, 110, 869 P.2d 1320, 1329 (1994). Both actions at law and suits in equity, however, were presented in courts. Yet, a nonjudicial foreclosure, by its very nature, avoids the court system. See Lee v. HSBC Bank USA, 121 Hawai'i 287, 289, 218 P.3d 775, 777 (2009) (explaining that HRS § 667-5 "authorizes nonjudicial foreclosure under a power of sale clause contained

in a mortgage"); Santiago, 137 Hawaiʻi at 155, 366 P.3d at 630 ("HRS § 667-5 does not provide the nonjudicial power of foreclosure but only allows its creation, if the parties choose to do so, within the four corners of a contract.") (citations omitted).  Thus, a nonjudicial foreclosure is in the nature of a contractual self-help remedy,  Lee, 121 Hawaiʻi at 292, 218 P.3d at 780, and is not "an action in law or a suit in equity."

U.S. Bank correctly argues, however, that according to HRS § 1-201, a "proceeding" includes "an action in law or a suit in equity."  Thus, a "proceeding," by definition, is not limited to "an action in law or a suit in equity."  Therefore, if a nonjudicial foreclosure conducted pursuant to HRS § 667-5 is a "proceeding," it could be a "proceeding to enforce a mortgage even if it does not qualify as "an action in law or a suit in equity."

"Proceeding" is not further defined by HRS § 560:1-201. "Because the term is not statutorily defined, this court 'may resort to legal or other well accepted dictionaries as one way to determine [its] ordinary meaning.'"  Gillan v. Government Employees Ins. Co., 119 Hawaiʻi 109, 116, 194 P.3d 1071, 1078 (2008).[12]

---

[12]    See also County of Haw. v. C&J Coupe Family Limited Partnership, 119 Hawaiʻi 352, 365, 198 P.3d 615, 628 (2008), referring to Black's Law Dictionary to define "proceedings" in the context of HRS § 101-27.

Black's Law Dictionary defines "proceeding" as follows:

> 1.  The regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and entry of judgment.  2.  Any procedure means for seeking redress from a tribunal or agency.  3.  An act or step that is part of a larger action.  4.  The business conducted by a court or other official body; a hearing.  5.  *Bankruptcy*.  A particular dispute or matter arising within a pending case – as opposed to the case as a whole. . . .
>
> > "Proceeding" is a word much used to express the business done in courts.  A proceeding in court is an act done by the authority or direction of the court, express or implied.  It is more comprehensive than the word 'action,' but it may include in its general sense all the steps taken or measures adopted in the prosecution or defense of an action, including the pleadings and judgment. . . .

The definition continues to further explain "action," making it clear that "action" also means a lawsuit brought in court. Id. The definition lists various types of "proceedings." With one exception, "administrative proceeding," all of the examples concern matters in court.

A nonjudicial foreclosure conducted pursuant to HRS § 667-5 is a contractual self-help remedy and is not conducted under the auspices of or supervised by any court or administrative agency. Therefore, it is not a "`proceeding' to enforce a mortgage" under HRS § 560:1-803(d)(1).[13]  Thus, U.S. Bank's nonjudicial foreclosure against the Estate was not exempt from the

---

[13]    Although another state's interpretation of similar statutes would not be binding on this court, it could be persuasive.  In this regard, we note that HRS §§ 560:1-201 and 560:3-803 are part of the Hawaiʻi Uniform Probate Code and that the Uniform Probate Code has been adopted by many other states.  Despite the many nonjudicial foreclosures nationwide, U.S. Bank does not cite a single case construing "proceeding to enforce a mortgage" under the probate code to include a nonjudicial foreclosure.

presentation of claim requirement and deadline under HRS §
560:3-803.

U.S. Bank alternatively argues that even if a nonjudicial
foreclosure is not a "proceeding to enforce a mortgage," it met
the presentation of claims requirement of HRS § 560:3-803(c)(2).
It asserts that the April 16, 2009 Default Notice, which was
mailed to the Property, where Margaret resided, satisfied HRS §
560:3-804(1),[14] and was timely presented within four months of
the Estate's default in early 2009, as required by HRS § 560:3-
803(c)(2).

The circuit court did not address this alternative
argument, which involves factual issues.  We therefore do not
decide whether U.S. Bank met the presentation of claim

---

[14]    HRS § 560:3-804(1) provides:

> §560:3-804  **Manner of presentation of claims**.  Claims
> against a decedent's estate may be presented as follows:
>
> (1)  The claimant may deliver or mail to the personal
> representative a written statement of the claim indicating its
> basis, the name and address of the claimant, and the amount
> claimed, or may file a written statement of the claim, in the
> form prescribed by rule, with the clerk of the court.  The claim
> is deemed presented on the first to occur of receipt of the
> written statement of claim by the personal representative, or the
> filing of the claim with the court.  If a claim is not yet due,
> the date when it will become due shall be stated.  If the claim
> is contingent or unliquidated, the nature of the uncertainty
> shall be stated.  If the claim is secured, the security shall be
> described.  Failure to describe correctly the security, the
> nature of any uncertainty, and the due date of a claim not yet
> due does not invalidate the presentation made. . . .

requirement with respect to the nonjudicial foreclosure and, if not, the effect of any such failure.  These issues are not before us.  We merely address the question of law raised in the certiorari application and hold that a nonjudicial foreclosure conducted pursuant to HRS § 667-5 is not a "proceeding to enforce a mortgage" under HRS § 560:3-803(d)(1), as further defined by HRS § 560:1-201, exempt from HRS § 560:3-803's time limits for presentation of claims against a decedent's estate.

**B.    The nonjudicial foreclosure sale was conducted in violation of HRS § 667-5(c)(1), which requires that information to reinstate a loan be provided within five days of a request, rendering the sale voidable, unless the Mounts are innocent purchasers for value.**

We next address the second issue on certiorari, whether the nonjudicial foreclosure sale was conducted in violation of HRS § 667-5(c)(1), based on U.S. Bank's failure to provide reinstatement figures to Lovelace in 2011 and, if so, the appropriate remedy.

**1.    As personal representative, Dirk has standing to assert U.S. Bank's failure to provide Lovelace with reinstatement figures, as Lovelace was acting as a co-personal representative when she made the request.**

As a preliminary matter, U.S. Bank asserts that the Apaos lack standing to raise the issue of its alleged failure to provide Lovelace with reinstatement figures in 2011.  As explained above, although U.S. Bank served Lovelace with a Notice of Intent to Foreclose in February 2011 as a personal

representative of the Estate, it refused to provide her with the reinstatement figures.  We therefore address U.S. Bank's threshold argument that the Apaos lack standing to raise a HRS § 667-5(c)(1) violation.  Keahole Def. Coal., Inc. v. Bd. of Land & Nat. Res., 110 Hawai'i 419, 427, 134 P.3d 585, 593 (2006), as amended (May 26, 2006) (standing may be addressed at any stage of a case).

As noted, in the Final Judgment, all claims against Lovelace were dismissed, and the Counterclaim and Third-Party Claim were brought only by Dirk.  At all relevant times, Dirk was a co-personal representative of the Estate with Lovelace. Dirk now remains as sole personal representative of the Estate. He asserted claims against U.S. Bank and the Mounts as a co-personal representative on behalf of the Estate.  U.S. Bank asserts that Dirk also lacks "standing" because Lovelace's request allegedly was not made on behalf of the Estate, but rather, to evaluate a settlement in the probate proceeding in which she and her family were adverse to the Estate.[15]  We disagree.

---

[15]    In her deposition, Lovelace testified that she hired an attorney in 2008 to bring the probate case against Margaret and Dirk due to "[y]ears of non-action on their part and mismanagement of the estate[,]" including non-payment of taxes, and failure to make any effort to distribute assets to the beneficiaries.

With respect to U.S. Bank's assertion, whether or not Lovelace asserted claims against the Estate before being appointed a co-personal representative, there is no dispute that Lovelace requested reinstatement information beginning in February 2011 only after she was served with the Notice of Intent to Foreclose, and that she requested reinstatement in her capacity as co-personal representative, acting on behalf of the Estate.

A personal representative is a fiduciary acting on behalf of an estate.  HRS § 560:3-703(a)(1997).  Actions taken by a personal representative that are beneficial to an estate inure to the benefit of the estate.  HRS § 560:3-701 (1996).  As Lovelace's requests for reinstatement figures were made on behalf of the Estate, any rights that inure to the Estate based upon her requests for reinstatement figures belong to the Estate.  Dirk, as the current sole personal representative of the Estate, therefore has standing to raise the HRS § 667-5(c)(1) violation on behalf of the Estate.

**2.    U.S. Bank violated HRS § 667-5(c)(1) by not providing Lovelace with reinstatement figures.**

HRS § 667-5(c)(1) provides in relevant part:

(c) Upon the request of any person entitled to notice pursuant to this section and sections 667-5.5 and 667-6, the attorney, the mortgagee, successor, or person represented by the attorney shall disclose to the requestor the following information:

(1) The amount to cure the default, together with the estimated amount of the foreclosing mortgagee's

> attorneys' fees and costs, and all other fees and costs estimated to be incurred by the foreclosing mortgagee related to the default prior to the auction within five business days of the request[.]

In <u>Santiago</u>, 137 Hawai'i 137, 366 P.3d 612, we stated:

> The purpose that prompted the addition of HRS § 667-5(c) to the foreclosure statute in 2008 was to "ensure that the different nonjudicial foreclosure processes include provisions for interested parties to <u>receive sufficient notice and obtain information</u> about the intent to foreclose [and] <u>amounts to cure the mortgage default</u>." Conf. Comm. Rep. No. 3-08, in 2008 House Journal at 1710, 2008 Senate Journal at 793.  Evident from the legislative history of HRS § 667-5(c) is the recognition that the right to cure a default is intrinsic in the law and that, therefore, HRS § 677-5(c) merely codified this right to ensure that interested parties were adequately apprised of it.
>
> The common-law right to cure a default originated from the fundamental premise that mortgage foreclosure is a proceeding equitable in nature and is thus governed by the rules of equity. Because equity abhors forfeitures, and regards and treats as done what ought to be done, it is typical in foreclosure cases that a right to cure a default and stop the foreclosure continues up to the day of the confirmation of the sale. Thus, Hawaii's courts <u>would not prevent a mortgagor from curing the default</u> and halting the foreclosure prior to the entry of a written order confirming the foreclosure sale.  Accordingly, our interpretation that HRS § 667-5(c) provides a right to cure is directed by HRS § 667-5(c)'s codification of the same right under the common law. To hold otherwise would be to disregard the emanating purpose of HRS § 667-5(c) and to indirectly nullify the common-law right to cure as incorporated in HRS § 667-5(c).

<u>Id.</u>, 137 Hawai'i at 631-32, 366 P.3d 156-57 (emphases in original, internal footnotes, case citations, and case quotation marks omitted).  The circuit court and the ICA ruled that HRS § 667-5(c)(1) was not triggered because Lovelace failed to establish herself as entitled to notice.  They alternatively ruled that U.S. Bank had complied with the requirement to provide reinstatement figures because Dirk had received <u>reinstatement</u> figures on two occasions through Margaret in

February and April of 2010, and two payoff statements in February 2011.  U.S. Bank also argues that it did not have a "continuing obligation to provide reinstatement figures at the whim of the Estate after having previously complied."

Dirk, on the other hand, argues that U.S. Bank's failure to provide reinstatement figures to Lovelace after her repeated requests from February 2011 until the foreclosure sale on April 4, 2011 render the nonjudicial foreclosure sale void.

Even if U.S. Bank had provided reinstatement figures to Margaret in February and April of 2010, there is no dispute that U.S. Bank, for whatever reason, aborted the original nonjudicial foreclosure sale scheduled for April 1, 2010.  Ten months later, on February 3, 2011, it served the Notice of Intent to Foreclose on Lovelace as a personal representative (which still reflected a foreclosure sale date of April 1, 2010).  Reinstatement figures from early 2010 which were less than $90,000, were obviously no longer valid in early 2011, and were not the amounts required to "cure" the default.  As conceded by AHMS, the reinstatement figure was actually $145,486.69 as of March 7, 2011.  This was the amount required to "cure" the default.  The fact that AHMS mailed two payoff statements dated February 19 and 24, 2011 to the Property, reflecting payoff amounts of $567,635.26 and $573,146.86 is immaterial, because these amounts were not necessary to "cure" the default.

After U.S. Bank's attorneys served Lovelace with the Notice of Intent to Foreclose as personal representative of the Estate, AHMS refused to provide her with reinstatement figures, alleging that she had to provide proof that she was a personal representative entitled to reinstatement figures. Her alleged failure to provide sufficient authorization to receive the figures was the sole reason given by AHMS for refusing to provide Lovelace with the reinstatement figures. HRS § 667-5(c)(1), however, explicitly obligated U.S. Bank and/or its attorney to provide Lovelace with information regarding the amount required to cure the default. Therefore, Routh Crabtree repeatedly attempted to secure reinstatement figures to provide to Lovelace. Even though Routh Crabtree had explicitly acknowledged Lovelace as a personal representative and informed AHMS that she was entitled to reinstatement figures, AHMS ignored Routh Crabtree and told Lovelace it would not provide her with reinstatement figures unless she provided satisfactory evidence that she was a personal representative. She therefore emailed the order appointing her as co-personal representative, yet AHMS refused to accept it on the grounds it had handwritten information on it.

Routh Crabtree's attorneys served Lovelace with the Notice of Intent to Foreclose in her capacity as a personal representative. Routh Crabtree repeatedly acknowledged Lovelace

was entitled to receive the reinstatement figures she was requesting and repeatedly postponed the foreclosure sale. Yet, for whatever reason, the foreclosure sale took place on April 4, 2011.

As a co-personal representative of the Estate, Lovelace requested reinstatement figures after U.S. Bank's decision to proceed with the nonjudicial foreclosure sale in early 2011. Dirk's receipt of reinstatement figures in early 2010 did not eliminate U.S. Bank's obligation to provide "cure" or reinstatement figures in early 2011, after it chose to abort the April 2010 foreclosure sale, then rescheduled it in 2011. In addition, whether or not Margaret received payoff figures in February 2011, and whether she provided those figures to Dirk is immaterial, as the "amount to cure the default" under HRS § 667-5(c)(1) were the reinstatement figures, as clearly acknowledged by AHMS and Routh Crabtree.

Based on the undisputed factual chronology and record of this case, U.S. Bank's argument that it did not have a "continuing obligation to provide reinstatement figures at the whim of the Estate after having previously complied" is devoid of merit.  Even its law firm acknowledged U.S. Bank's obligation to provide reinstatement figures to Lovelace before proceeding with a foreclosure sale.  Therefore, U.S. Bank failed to comply with its obligation under HRS § 667-5(c)(1).

The Mounts and U.S. Bank argue that the Apaos' interpretation of HRS § 667-5(c) is pre-empted by the federal Gramm Leach Bliley Act, 15 U.S.C.A. § 6801 et seq. ("GLBA") "to the extent it required the mortgagee to provide reinstatement information to anyone other than the customer on the account, unless the person requesting the information established that he/she was legitimately entitled to receive the information." Regarding the protection of nonpublic personal information, the GLBA provides, in pertinent part, "It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C.A. § 6801(a). In addition, the GLBA pre-empts state laws that are inconsistent with the GLBA "only to the extent of the inconsistency." 15 U.S.C.A. § 6807(a). This argument lacks merit because Lovelace was obviously entitled to receive the information, as clearly acknowledged by U.S. Bank's law firm.

3. **The foreclosure sale is voidable, unless the Mounts are innocent purchasers for value.**

Based on U.S. Bank's failure to provide reinstatement or cure information to Lovelace, as required by HRS § 667-5(c)(1), the nonjudicial foreclosure sale was conducted in violation of HRS § 667-5.

As far back as 1884, this court voided a mortgage sale of real estate and livestock because the mortgagee had not complied with the conditions of the power of sale by scheduling the foreclosure sale one day too early.  Silva v. Lopez, 5 Haw. 262 (1884)  In Lee, 121 Hawaiʻi at 296, 218 P.3d at 784, we held that "an agreement created at a foreclosure sale conducted pursuant to HRS section 667-5 is void and unenforceable where the foreclosure sale is invalid under the statute.  The Ninth Circuit Court of Appeals has noted that, under Hawaiʻi law, "[m]ortgagee violations of the nonjudicial foreclosure requirements of HRS § 667-5, whether those violations are grievously prejudicial or merely technical, voids a subsequent foreclosure sale. . . ."  In re Kekauoha-Alisa, 674 F.3d 1083, 1089-90 (9th Cir. 2012).

The facts in Lee and Kekauoha-Alisa differ from the facts in this case.  In Lee, the high bidder at the nonjudicial foreclosure sale had not completed the sale.  121 Hawaiʻi at 289.  Under those facts, we held that the sale was void and that the high bidder was entitled only to return of his down payment plus accrued interest.  Id.  In Kekauoha-Alisa, the lender itself had purchased the property through a credit bid, so no third party was involved.  674 F.3d at 1086.

In this case, however, the Mounts completed the sale, took possession of the Property, and have now had the Property for some time, similar to the facts in Santiago. In Santiago, we held that "[w]here it is determined that the nonjudicial foreclosure of a property is wrongful, the sale of the property is invalid and voidable at the election of the mortgagor, who shall then regain title to and possession of the property." 137 Hawaiʻi at 158, 366 P.3d at 633. We also held that where the property has passed into the hands of an innocent purchaser for value, rendering the voiding of a foreclosure sale impracticable, an action at law for damages is generally the appropriate remedy. Id.

As noted earlier, based on its other rulings in favor of the Mounts, the circuit court deemed moot their motion for partial summary judgment alleging bona fide purchaser status, and the Mounts withdrew that motion. Therefore, the circuit court never addressed whether the Mounts qualify as "innocent purchasers for value" under the Santiago rule. Upon remand, the circuit court is to apply Santiago to determine an appropriate remedy for the wrongful foreclosure.

U.S. Bank's nonjudicial foreclosure was conducted in violation of the requirements of HRS § 667-5(c)(1).[16] Because

_____

[16] As stated in footnote 1, HRS § 667-5 was repealed in 2012, before the filing of the Final Judgment. The repeal of HRS § 667-5, however, does
(continued. . .)

the foreclosure sale was wrongful we need not address the additional issues raised by the Apaos concerning the writ of possession, damages, and attorneys' fees and costs, as those rulings are also vacated.

## V.    Conclusion

Based on the foregoing, we vacate the ICA's Judgment on Appeal and the circuit court's Final Judgment along with all the orders, writs, and/or judgments referenced in the Final Judgment, and we remand the case to the circuit court for further proceedings consistent with this opinion.

Frederick J. Arensmeyer          /s/ Mark E. Recktenwald
for petitioners
                                 /s/ Paula A. Nakayama

Paul Alston and
J. Blaine Rogers                 /s/ Sabrina S. McKenna
for respondent
U.S. Bank National               /s/ Richard W. Pollack
Association, a
National Association             /s/ Michael D. Wilson
as Trustee for the
Structured Asset
Securities Corporation
Mortgage Pass-Through
Certificates 2005-SC1

Mary Martin,
Michael C. Bird, and



---

(. . .continued)
not affect this appeal.  Pursuant to HRS § 1-10 (2009), "[t]he repeal of any law shall not affect any act done, or any right accruing, accrued, acquired, or established, or any suit or proceedings had or commenced in any civil case, before the time when the repeal takes effect."  See Graham Constr. Supply, Inc. v. Schrader Constr., Inc., 63 Haw. 540, 544 n.6, 632 P.2d 649, 651 n.6 (1981) (recognizing HRS § 1-10 as a "general saving statute"). Because the nonjudicial foreclosure was conducted pursuant to HRS § 667-5, its repeal does not affect this appeal.

Summer H. Kaiawe
for respondents
Gerald K. Mount, Jr.
and Jane R. Mount